IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

TAMMY SHERRELL WILSON,

      Plaintiff,

v.                                  Case No. 3:18-cv-00890

WEXFORD MEDICAL and
ADMINISTRATION/STAFF
AT FAULT, (1990 through present);
WARDEN LORI NOHE; J. D. SALLAZ;
SUSAN BIRDSONG; CORRECTIONAL
OFFICER CHERYL SPENCER;
NATHAN BALL; BETSY JIVIDEN;
CANDY DAVIS; C. J. RIDER; and
HEIDI BEEGLE, R.N.,

      Defendants.

## PROPOSED FINDINGS AND RECOMMENDATIONS

Plaintiff, Tammy Sherrell Wilson (hereinafter also referred to as "Wilson"), proceeding *pro se* and currently incarcerated at the Lakin Correctional Center ("LCC") in West Columbia, West Virginia, seeks prospective relief and money damages under 42 U.S.C. § 1983 for alleged violations of her civil rights. This matter is assigned to the Honorable Robert C. Chambers, United States District Judge, and by standing order has been referred to the undersigned United States Magistrate Judge for total pretrial management and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). (ECF No. 3).

Pending before the Court are the following motions:

1. Motion of Tammy Sherrell Wilson for Summary Judgment, (ECF No. 198);

2. Motion of Wexford Medical and Administration/Staff at Fault ("Wexford") for Summary Judgment, (ECF No. 201);

3. Motion of Heidi Beegle, R.N., ("Beegle") for Summary Judgment, (ECF No. 203); and

4. Motion of Lori Nohe, J. D. Sallaz, Susan Birdsong, Cheryl Spencer, Nathan Ball, C. J. Rider, and Betsy Jividen (collectively referred to as the "DCR defendants" or individually by their last name) for Summary Judgment, (ECF No. 205).

The parties have filed responses and replies to the pending motions; therefore, the issues have been fully briefed. After thoroughly considering the arguments and supporting materials, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** the Summary Judgment Motion filed by Wilson, (ECF No. 198); **GRANT** the Summary Judgment Motions of Wexford, Beegle, and the DCR defendants, (ECF Nos. 201, 203, 205); **GRANT** the dismissal of defendant Candy Davis, who was never properly served with process; **DISMISS** the amended complaint, with prejudice; and **REMOVE** this case from the docket of the Court.

## I.    Introduction

In 1991, Wilson was convicted of first degree murder in the Circuit Court of Monongalia County, West Virginia and was sentenced to life in prison. Wilson served her sentence at the Pruntytown Correctional Center ("Pruntytown") in Grafton, West Virginia, until January 2007, when she was transferred to LCC. All of Wilson's claims arise from her incarceration at LCC, a maximum security all-female correctional facility operated by the West Virginia Division of Corrections and Rehabilitation ("DCR").

On May 3, 2018, Wilson filed the complaint herein, which she moved to amend on July 2, 2019. (ECF Nos. 3, 68). Wilson's motion was partially granted and partially denied.

2

(ECF Nos. 83, 84, 97). Given the length of her initial pleading, Wilson was permitted to incorporate by reference her complaint into the amended complaint. (ECF No. 94). Therefore, the complaint, amended complaint, and supplemental support, (ECF Nos. 3, 6, 7, 8, 9, 15, 18, 26, 94), are read together (collectively referred to as the "amended complaint") when considering the pending motions for summary judgment. In the amended complaint, Wilson makes the following overarching claims: (1) she was denied adequate medical care and supplies; (2) she was denied access to the courts; (3) she was retaliated against, harassed, and subjected to discrimination; (4) the right to practice her religion was impeded; and (5) the DCR discriminated against her and fellow female inmates by providing better services to inmates at Mount Olive Correctional Complex ("MOCC"), the DCR's maximum security all-male correctional institution. Wilson also asserts a "liberty interest" and associated due process violation related to alleged oral "assurances" made by representatives of the DCR.

## II.   **Standard of Review**

The parties have all filed motions seeking summary judgment in their favor. Summary judgment is proper under Fed. R. Civ. P. 56 when no genuine issue of material fact is in dispute, and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986). A fact is material if it "might affect the outcome of the suit under the governing law," and a disputed issue of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. The party moving for summary judgment bears the initial burden of showing "an absence of evidence that demonstrates the existence of a genuine issue of fact for trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).

If the moving party meets this burden, then the burden shifts to the nonmoving party, who "must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 322, n.3. The nonmoving party must do more than rely upon the allegations or the denial of allegations contained in his pleading to defeat a motion for summary judgment; instead, he must offer some "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson,* 477 U.S. at 256. Concrete evidence includes "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). The court must not resolve disputed facts, nor weigh the evidence. *Russell v. Microdyne Corp.,* 65 F.3d 1229, 1239 (4th Cir. 1995). Instead, the court must accept as true the facts asserted by the nonmoving party and review the evidence "draw[ing] all justifiable inferences" in its favor. *Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 520 (1991).

Even still, the "mere existence of a scintilla of evidence" favoring the non-moving party will not prevent entry of summary judgment. *Anderson,* 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci v. DeStefano,* 557 U.S. 557, 586 (2009), (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)). Thus, while any permissible inferences to be drawn from the underlying facts "must be viewed in the light most favorable to the party opposing the motion," *Matsushita Elec. Indus. Co*, 475 U.S. at 587, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Felty v. Graves-Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir. 1987) (citation omitted).

4

## III.    <u>Discussion</u>

Title 42 U.S.C. § 1983 provides a remedy to parties who are deprived of federally protected civil rights by persons acting under color of any state "law, statute, ordinance, regulation, custom, or usage." Congress enacted § 1983 "to enforce provisions of the Fourteenth Amendment against those who carry a badge of authority of a State and represent it in some capacity, whether they act in accordance with their authority or misuse it." *Monroe v. Pape,* 365 U.S. 167, 171-172 (1961). In order to state a viable claim under § 1983, a plaintiff must show that: (1) a person deprived him or her of a federally protected civil right, privilege, or immunity and (2) that the person did so under color of State law. *See American Mfr. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50-52 (1999). In this case, Wilson alleges violations of the Eighth Amendment to the United States Constitution; violations of due process, equal protection, and liberty interests; retaliation; and infringement of religious freedoms.

Wilson's claims are subject to the provisions of the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a) ("PRLA"). The PLRA requires inmates to exhaust administrative remedies **prior to** filing a complaint in federal court. 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."); *see, also, Porter v. Nussle,* 534 U.S. 516, 524 (2002) ("Once within the discretion of the district court, exhaustion in cases covered by § 1997e(a) is now mandatory. All available remedies must now be exhausted; those remedies need not meet federal standards, nor must they be plain, speedy, and effective. Even when the prisoner seeks relief not available in grievance proceedings, notably money damages, exhaustion is a prerequisite to suit.") (citations and

internal quotation marks omitted)). However, administrative exhaustion is "not a jurisdictional requirement and does not impose a heightened pleading requirement on the prisoner." *Hart v. Roderick,* No. CV GLR-15-2054, 2016 WL 3940219, at *3 (D. Md. July 21, 2016) (citations omitted). Instead, exhaustion is an affirmative defense, and the defendant bears the burden of proving that a prisoner failed to exhaust administrative remedies. *Id.*

The Supreme Court of the United States ("Supreme Court") has repeatedly held that courts may not read futility or other exceptions into the PLRA that are not part of its textual mandate. *Ross v. Blake,* 136 S. Ct. 1850, 1857 (2016) (holding that "[m]andatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion.") Nevertheless, the Supreme Court pointed out that the PLRA does contain one explicit exception; an inmate need not exhaust "unavailable" remedies. *Id.* at 1858. The Court identified "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief." *Id.* at 1859. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide relief to aggrieved inmates." *Id.* Second, an administrative process is likewise unavailable when it is "so opaque" that "no ordinary prisoner can discern or navigate it." *Id.* Finally, an inmate need not exhaust administrative remedies when prison officials thwart the inmate's access to the grievance procedure "through machination, misrepresentation, or intimidation." *Id.* at 1860. "[S]uch interference with an inmate's pursuit of relief renders the administrative process unavailable." *Id.*

### A.  Denial and Delay of Medical Care—Defendants Wexford, Beegle

The Eighth Amendment to the United States Constitution requires the State to provide its prison inmates with basic medical care. *Estelle v. Gamble,* 429 U.S. 97, 103, (1976). A prison official violates this constitutional guarantee when he responds to a prisoner's serious medical need with deliberate indifference. *Estelle,* 429 U.S. at 104; *also Farmer v. Brennan,* 511 U.S. 825, 834 (1994). In order for Wilson to receive, or withstand, summary judgment on her claims that Wexford and Beegle violated her Eighth Amendment right to medical care, she must show both (1) the deprivation of a basic human need that was "sufficiently serious," when measured by an objective standard, and (2) that the responsible prison official had a "sufficiently culpable state of mind." *Iko v. Shreve*, 535 F.3d 225, 238 (4th Cir. 2008) (citing *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996)). Thus, a cognizable Eighth Amendment claim contains two components, one objective and one subjective. "These requirements spring from the text of the amendment itself; absent intentionality, a condition imposed upon an inmate cannot properly be called 'punishment,' and absent severity, a punishment cannot be called 'cruel and unusual.'" *Iko*, 535 F.3d at 238 (citing *Wilson v. Seiter,* 501 U.S. 294, 298-300 (1991)).

To satisfy the objective component, Wilson must show that the alleged lack of medical care caused or constituted an extreme deprivation. *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003). "[T]o demonstrate such an extreme deprivation, [Plaintiff] must allege 'a serious or significant physical or emotional injury resulting from the challenged conditions or demonstrate a substantial risk of such serious harm resulting from [his] exposure to the challenged conditions.'" *Odom v. South Carolina Dept. of Corrections*, 349 F.3d 765, 770 (4th Cir. 2003) (quoting *De'Lonta*, 330 F.3d at 634).

"Compelling a showing of significant physical or emotional harm, or a grave risk of such harm, infuses an element of objectivity into the analysis, lest resolution of the seriousness of the deprivation devolve into an application of the subjective views of the judges deciding the question." *Shakka v. Smith,* 71 F.3d 162, 166 (4th Cir. 1995) (citing *Strickler v. Waters,* 989 F.2d 1375, 1379–80 (4th Cir. 1993)). "The showing necessary to demonstrate that the deprivation of which a prisoner complains is serious enough to constitute cruel and unusual punishment 'varies according to the nature of the alleged constitutional violation.'" *Id.* (quoting *Hudson v. McMillian,* 503 U.S. 1, 5 (1992)).

To establish the subjective component, Wilson must establish a "deliberate indifference" to her health or safety by the defendants. *Farmer*, 511 U.S. at 834. The Supreme Court explained:

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer*, 511 U.S. at 837. Deliberate indifference is more than mere negligence, but less than malice. *Flores v. Stevenson,* Civil Action No. 2:11–cv–01278–TMC–BHH, 2012 WL 2803721 (D.S.C. May 11, 2012) (citing *Williams*, 77 F.3d at 761). Put simply, the defendants had a sufficiently culpable state of mind if they were aware of an excessive risk of harm to Wilson's health, but were deliberately indifferent to that risk. *See Wilson*, 501 U.S. at 303. "[T]he 'inadvertent failure to provide adequate medical care' tantamount to negligence does not satisfy the deliberate indifference standard." *Sparks v. Singh*, 690 F. App'x 598, 604 (10th Cir. 2017) (quoting *Estelle*, 429 U.S. at 105–06). To establish that a prison official's actions constitute deliberate indifference to a serious medical need, the

8

treatment must be "so grossly incompetent, inadequate or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir. 1986).

If the requisite subjective knowledge is established, an official may still avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *Farmer*, 511 U.S. at 844. An inmate is not entitled to unqualified access to health care, and treatment may be limited to what is medically necessary and not "that which may be considered merely desirable" to the inmate. *Bowring v. Godwin,* 551 F.2d 44, 47-48 (4th Cir. 1977). A mere difference of opinion about whether medical care is needed is usually insufficient to maintain a valid cause of action. *Id.* at 48 (citing *Russell v. Sheffer,* 528 F.2d 318, 319 (4th Cir. 1975)).

Wilson's complaints about her medical care, in part, involve an alleged delay in care, rather than an outright denial of care. "A delay in treatment may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain." *Abraham v. McDonald*, 493 F. App'x. 465, 466 (4th Cir. 2012); *Smith v. Smith*, 589 F.3d 736, 739 (4th Cir. 2009) (citing *Estelle*, 429 U.S. at 104-05). The United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") has explained: "Where a deliberate indifference claim is predicated on a delay in medical care, we have ruled that there is no Eighth Amendment violation unless 'the delay results in some substantial harm to the patient,' such as a 'marked' exacerbation of the prisoner's medical condition or 'frequent complaints of severe pain.'" *Webb v. Hamidullah*, 281 F. App'x 159, 166-67 (4th Cir. 2008). "Substantial harm can be shown by 'lifelong handicap, permanent loss, or considerable pain.'" *Shabazz v. Prison Health Servs. Inc.*, No. 3:10CV190, 2011 WL 3489661, at *6 (E.D. Va. 2011) (quoting *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir.

2001)).

### 1. Wilson's Allegations and Motion for Summary Judgment

Wilson alleges that Wexford, LCC's contractor for health care services, and Heidi Beegle, R.N., the nurse supervisor at LCC, violated the Eighth Amendment on four instances in which they allegedly denied or delayed medical care to Wilson. (ECF No. 198). First, she claims that on November 18, 2017, she fell in LCC's cafeteria and injured her left knee, right wrist, and mouth. According to Wilson, she was eating breakfast at around 7:30 a.m. when three inmates got into a fight. Correctional officers ordered all of the other inmates to "hit the floor." When Wilson tried to comply, she fell forcibly onto the concrete floor, breaking her dental partial and smacking her wrist and knee on the hard surface. Years earlier, Wilson had fractured her knee, requiring a reparative operation that involved the implantation of surgical hardware, which remained present in her knee. In addition, two months prior to her fall, Wilson had fallen and broken her right wrist, requiring an open reduction, internal fixation of multiple fractures with placement of surgical hardware. The post-operative cast on Wilson's right wrist had been removed just twelve days before her fall. Wilson states that as a result of the fall, she was bleeding from her mouth and cheek, had a swollen wrist, and was experiencing pain in her wrist, knee, and mouth. Correctional officers attempted to have her seen by the medical unit on three occasions that day, but she was refused care. (ECF No. 3 at 12-13). Wilson indicates that she did not receive any post-fall medical care until more than three weeks later, on December 12, 2017, after she filed a grievance. (ECF No. 3 at 13). She further asserts that x-rays were supposed to be taken of her knee and wrist in December 2017, but were not completed until June 2018. Wilson states that she requested x-rays, and x-rays were ordered prior to the filing of the lawsuit, but Wexford would not complete

them. Wilson argues that it was not until after she filed her complaint herein that she finally received x-rays of her wrist and knee. Wilson complains that her hand and wrist go numb; she can barely walk at times due to her knee; and she is unable to practice her profession of cosmetology.

Wilson argues that Wexford should be held summarily liable for violating her Eighth Amendment rights by enforcing an unconstitutional policy, which prevented her from obtaining medical treatment on the day of her fall. (ECF No. 198 at 4). Wilson asserts that efforts by Correctional Officers Hester and Wasonga to have Wilson examined on November 18 were rebuffed due to Wexford's policy of restricting medical care to inmates based on the last digit of their DCR number. Inmates with an even digit were allowed medical care on Mondays, Wednesdays, and Fridays, while those with an odd digit were seen on Tuesdays, Thursdays, and Saturdays. Wilson fell on a Saturday, but because her DCR number ended with a 2, she was refused treatment. In support of her claims, Wilson contends that the offending policy has since been replaced, allowing inmates to have sick call on any day. However, Wexford's improper policy was in place at the relevant time and caused Wilson to receive delayed care. Wilson claims that Beegle is also liable, because she carried out Wexford's improper policy and was the one who refused Wilson evaluation and treatment.[1] Wilson points to responses from Beegle to grievances that Wilson filed and also notes that Beegle has since been fired by Wexford. (ECF No. 198 at 6-7).

Second, Wilson challenges Wexford's policy or practice of discontinuing medical items that had been previously offered through the DCR. Wilson alleges that Wexford has denied her medical items that she was permitted to have while at Pruntytown, and this

---

[1] It should be noted that in a settlement letter to counsel for Wexford and Beegle, Wilson indicates that the Wexford employees personally responsible for denying her care on November 18, 2017 were nurses April Millenger and Dixie Gardner, who are not defendants in this action. (ECF No. 225 at 7).

denial has diminished the quality of her life. These items include a knee brace, abdominal binder, heating pad, boot brace, TENS unit, B-12 shots, Menest prescriptions, muscle rub, medical shoes, Vitamin E, insoles, Preparation-H, protein powder, egg crate mattress, and pain medications. Wilson states that, due to her age and various injuries, she suffers from chronic pain on her entire right side, which prevents her from sleeping. She used an egg crate mattress top while at Pruntytown, but that item was confiscated upon her arrival at LCC, and Wexford refuses to allow Wilson to replace it. She claims that nerve injuries on her right side were alleviated by the use of a heating pad and TENS unit; however, Wexford has likewise denied her access to those items. Wilson is a vegetarian and also has an allergy to soy; accordingly, she needs protein and vitamin supplements. Even though Wilson has agreed to pay for these items herself, Wexford refuses to order them. Wilson indicates that she has asked for milk products on numerous occasions, but LCC will not give them to her without the approval of Wexford. Wilson anecdotally offers, as evidence of Wexford's callous and indifferent treatment, an incident in which Wilson, a cancer survivor, had an inconclusive mammogram result that required follow-up. Instead of receiving the follow-up, the results of the mammogram were not conveyed to Wilson until one month after the examination. Six weeks after the mammogram, she had still not received any follow-up evaluation. (ECF No. 198 at 10). Wilson contends that, considering she has been an inmate for thirty years and has been treated by Wexford for over a decade, Wexford should be familiar with her history and her need for a higher level of care than she is receiving.

Third, Wilson claims that she has been denied medical care related to recalled mesh implanted in her abdomen during a hernia surgery. Wilson states that, in 2010, the United States Army notified the medical unit at LCC that Wilson had received mesh

during a hernia surgery that had since been recalled. Despite her efforts to have this issue addressed, Wexford has done nothing to remedy the situation. Wilson believes the mesh is "floating" around inside her abdomen, causing her danger and discomfort. In addition, Wilson claims that she has experienced pain and irritation since July 2009 related either to the mesh or a hernia and, other than receiving an abdominal binder, has not receive medical attention for that problem since 2009.

Fourth, although Wilson has not formally requested a supplementation of her complaint under Rule 15, she alleges that she has been denied urgent dental care. Wilson notes that she saw the dentist in the summer of 2019 regarding tooth pain. The dentist examined her and planned to discuss her options for treatment after he returned from an upcoming vacation. That communication should have occurred in September or October 2019. However, a follow-up visit with the dentist was not scheduled. Wilson filed several grievances over the matter, in which she advised that she was in considerable pain. Wexford simply responded that Wilson was "on the list" to see the dentist. As of July 30 2020, Wilson still had received no follow-up dental care. Wilson indicates that Beegle was the care provider that obstructed Wilson's efforts to receive dental care. During a conference call between Beegle, her lawyer, and Wilson, Beegle admitted that it was her fault that Wilson had not received the needed dental care and promised to expedite it. Notwithstanding Beegle's assurances, more than ten months after Wilson began to complain of dental pain, she still had not received treatment.

Wexford and Beegle filed a response to Wilson's summary judgment motion. (ECF No. 210). In the response, they advance two arguments as to why Wilson has not met the summary judgment standard. First, they note that Wilson has not cited to any legal support for her motion. Second, they contend that Wilson has offered no evidence

demonstrating an Eighth Amendment violation. Instead, Wilson makes conclusory statements of liability in contravention of the evidence, which shows that she received appropriate care for every serious medical condition presented to Wexford, and that she has not suffered substantial harm from any alleged delay in treatment.

In reply, Wilson reiterates her position, providing citations to case law setting forth the duties of Wexford and Beegle under the Eighth Amendment, and asserting that she has suffered substantial harm in the form of nerve damage to her wrist, which prevents her from using her arm effectively. (ECF No. 216). Wilson further claims that the nerve damage prevents her from practicing her occupation as a cosmetologist as she "cannot even open a child restraint medical cap from a bottle." (*Id.* at 5).

### 2. *Wexford and Beegle's Motions for Summary Judgment*

Wexford argues that it is entitled to summary judgment, because Wilson has failed to show that a policy or custom of Wexford resulted in her alleged denial of care on November 18, 2017. (ECF No. 202). According to Wexford, a private corporation is liable under § 1983 *only* when an official policy or custom of the corporation causes the alleged deprivation of rights. Wexford acknowledges that it had in place a policy that allowed inmates with DCR numbers ending in an even number to be seen for routine sick call on Mondays, Wednesdays, and Fridays, and inmates with DCR numbers ending in odd numbers to be seen on Tuesdays, Thursdays, and Saturdays. However, Wexford denies that the policy played any role in Wilson's lack of treatment on November 18, 2017. Wexford indicates that its policy also states that "if an inmate needed urgent medical assistance," the inmate could be seen regardless of her DCR number. (ECF Nos. 202 at 5, 217-1). Wexford contends that Wilson did not receive medical care on November 18, 2017, because she declined it. Wexford further asserts that Wilson has failed to show that she

14

had a serious medical need on November 18 that required immediate care. Wexford emphasizes that when Wilson was seen by Dr. Sherri Johnson, a Wexford physician, on December 12, 2017, Wilson denied having any problem with her wrist and instead only complained of knee pain. Dr. Johnson performed an examination of Wilson and did not identify any specific problem with Wilson's knee. In addition, Dr. Johnson concluded that Wilson did not need a supportive device or any special treatment at that time.

Wexford argues that Wilson's rendition of facts is not consistent with the medical records, as her December 2018 knee and wrist x-rays show only degenerative changes with no acute findings. Wexford also points to the lack of evidence offered by Wilson that her fall, her inability to obtain over-the-counter medical supplies and prescriptions, and her hernia mesh caused her injury. Wexford contends that there is no evidence Wilson has retained hernia mesh given that Dr. Johnson reviewed Wilson's operative records to identify a medical condition associated with abdominal mesh, and could not verify from those documents that Wilson had in fact been implanted with mesh. Moreover, Wexford states, Wilson testified in her deposition on June 16, 2020 that she had now received all of the medical aids, devices, and medications she requested, with the exception of a heating pad, and the heating pad was awaiting the approval of the Warden.

Separate from the merits, Wexford contends that Wilson's claims related to the knee brace, over-the-counter medications, and mesh should be summarily dismissed, because she failed to exhaust administrative remedies. (ECF No. 202). Wexford points out that Wilson never filed a grievance related to her mesh issue, or the need for supplies, such as the knee brace and over-the-counter remedies. Furthermore, with the exception of one grievance, (17-LCC-B-152), Wilson did not pursue any of the grievances through all levels of the DCR's grievance procedure.

Along these lines, Beegle argues that Wilson never filed a grievance specific to Beegle and did not exhaust the grievances she did file. (ECF No. 204). Beegle stresses that under the law of this circuit, a prisoner must show substantial harm resulting from a delay in treatment. In light of Wilson's x-rays, which show only degenerative changes, Wilson cannot meet that standard.

Wilson filed a joint response to the motions for summary judgment of Beegle and Wexford. (ECF No. 215). Wilson provides additional evidence supporting her claim that Wexford's policy prevented her from receiving treatment on the day that she fell. She notes that it took three requests from correctional officers, two grievances, and over three weeks before she was given a medical examination. Wilson also highlights the indifference of the medical providers by supplying documentation reflecting illogical decisions by the medical unit; for example, Wexford's clearance of Wilson to perform heavy job duties despite the fact that she still had a cast on her arm post-surgery, and the medical unit's December 7, 2017 cancellation of an order for ice to be applied to Wilson's knee when no one had yet bothered to examine her. Wilson claims that she has a scar on her face from the dental plate, as well as right-sided pain and limitations related to the fall. Wilson disputes that she failed to exhaust her administrative remedies, pointing to grievance numbers 17 LCC B 152 and 18 LCC A 064.

Wexford and Beegle filed a joint reply to Wilson's response, again reiterating that any inmate could be seen on an off-day if the inmate had a serious medical condition. (ECF No. 217). They contend that Wilson was not brought to the unit on the 18th of November, because there was no correctional officer to escort her, not because Wexford/Beegle refused care.

16

### 3. Evidence

Wilson files copies of multiple Inmate Medical Services Request forms ("IMSR"), which she submitted to Wexford over the relevant time period. The first is dated December 6, 2017 and requests medication and information "on provider appointment reference over mesh recall and problems arising from incident of November 18, 2017." (ECF No. 215-1 at 65). The second one was submitted on December 9, 2017, stating that Wilson went to sick call on December 6, 2017 and was told by the nurse that, since she was seeing the doctor the next day, the doctor would address her concerns. (ECF No. 215-1 at 68). Wilson stated that she might have an "open nerve" and it was very painful. (*Id.*). On June 6 and 7, 2018, Wilson filed an IMSR related to mesh, stating that it was painful. (ECF No. 94 at 56). On November 23, 2018, she asked for refills of medication and commented that her wrist was not doing well; it did not bear weight, and she was having trouble opening things. (ECF No. 94 at 73). In March 2019, Wilson requested protein powder, which Beegle stated was not medically necessary. (*Id.* at 79). On April 25, 2020, Wilson submitted another IMSR asking why she had not been seen by the dentist in follow-up. (ECF No. 215-1 at 60). She was told to come to open sick call for evaluation although she had been to open sick call three times since October for the same issue. (*Id.*). The next IMSR was completed on May 3, 2020, again asking about dental care. (ECF No. 215-1 at 62). Another IMSR was submitted on May 4, 2020. (ECF No. 198-1 at 83). Wilson was inquiring about the status of the insoles she was prescribed months earlier. On May 7, 2020, nursing services responded to Wilson about her inquiries related to dental care. (*Id.*). She was told that due to COVID-19, dental work was limited to emergency procedures, and Wilson would remain on the list to see a dentist when available. (*Id.*).

Wilson also supplies an affidavit signed by Wanda Patterson, an inmate who was

17

with Wilson at the time of her fall in November 2017. (ECF No. 225 at 58). In her affidavit, Wanda Patterson recounts that on November 18, 2017, the inmates were ordered to hit the floor after a fight broke out. Patterson was beside Wilson, who tried not to go all the way to the floor as she was favoring her arm. A correctional officer screamed at Wilson, and she "went down hard her arm gave out." (*Id.*). Patterson caught part of Wilson's face before it crashed to the ground, but heard a loud popping noise. Wilson was bleeding from her mouth.

In addition, Wilson files some correctional officer logs, documenting the period of time on November 18, 2017 that LCC was on lockdown, as well as the attempts made by correctional officers to have Wilson seen by the medical unit that day. (ECF No. 225 at 21, 23). Later that day, Wilson filed Grievance No. 17-LCC-B-571. (ECF No. 3-1 at 19). In the grievance, Wilson complained that she was denied medical care that day after injuring her knee and wrist. She indicated that a correctional officer had tried on three occasions to get her to the medical unit, as he could see Wilson's wrist swelling. The first time, her care was denied because the facility was on lockdown. The last attempt was made at 6:50 p.m. when Wilson again asked to be seen by medical personnel. However, she was not taken to the medical unit. Wilson references in support a log book notation by C.O. Wasonga in which he states that Wilson asked to be seen by medical after the fight in the cafeteria. (ECF No. 215 at 5). She could not go earlier, because the facility was on lockdown. Later, she was prevented from going by pill call, which kept the medical officer busy. C.O. Wasonga called the medical officer again at 11:50, and the officer replied that Wilson had not been seen because she declined an examination. (*Id.*).

Twelve days later, on November 30, 2017, Beegle responded to the grievance indicating that she had no control over lockdown and Wilson would be evaluated when a

provider was available. She added that Wilson was already on pain medication. Wilson took this grievance through all of the proper steps, and it was officially denied on December 17, 2017. (ECF No. 215 at 5).

Wilson filed a grievance 17 LCC A 584 on Dec. 10, 2017, questioning why her injuries from November 18, 2017 had not yet been addressed. (ECF No. 3-1 at 21). Beegle said Wilson did not come on the 18th, and Wilson responded that they would not take her due to her inmate number. (*Id.*). Wilson appealed this grievance through the entire process, and it was denied on December 21, 2017. At her deposition, Wilson reiterated that she still has medical issues that had not been treated.

Wilson tendered several other grievances related to medical care. The first was submitted on March 17, 2017 and involved a prescription of Menest that had been discontinued. (ECF No. 215-1 at 59). Beegle responded to the grievance, indicating that the physician made the decision to discontinue the medication, so Wilson would need to speak with the physician. (*Id.*). Wilson exhausted the grievance procedure and was still told to speak with the physician. The second grievance was submitted by Wilson on February 20, 2018. (ECF No. 94 at 78). Wilson complained that some of her chronic care medications, which she had taken for 27 years, had been removed from the formulary, and she wanted them renewed. Wilson was asked to specify the medications, which she did, and Sallaz, LCC's Superintendent, responded that he would submit the list to the medical unit. This grievance was not exhausted. (*Id.*). On April 9, 2019, Wilson filed a grievance stating that a filling had fallen out of her left eye tooth; she had seen the dentist, was waiting to have impressions made, and wanted her dental care finished. (ECF No. 94 at 57-58). She was told that there was no fulltime dentist, so only emergencies were being seen, and her situation was not an emergency. Wilson exhausted this grievance.

Wilson also provides a review of her medical history, in which she states that her knee was fractured in 2002; she received an abdominal binder in 2009 and a knee brace in 2010. She placed her knee brace in storage sometime later, but it went missing, so she requested a new one in 2017. (ECF No. 225 at 47-48). Wilson supplies a copy of her medical record from June 30, 2010, demonstrating that she complained of pain related to her abdominal mesh that had been recalled. (ECF No. 94 at 55). She also submits a physician's order authorizing her to receive an abdominal binder on July 27, 2009. (*Id.* at 68). An new order for an abdominal binder was written on August 6, 2015. (*Id.* at 72).

Finally, Wilson files three patient authorization forms and a number of affidavits from other inmates detailing their own personal experiences with Wexford and Beegle, clearly intended to show a pattern or practice of Wexford and Beegle of being indifferent to serious medical needs.[2] The first patient authorization form, dated October 11, 2017, authorizes Wilson to apply ice to her knee, as needed, for 180 days. (ECF No. 215-1 at 56). The second form shows that Dr. Johnson discontinued the ice authorization on December 7, 2017. (*Id.* at 66). The last authorization form is dated July 9, 2019 and provides Wilson with a knee brace indefinitely. (*Id.* at 61).

Defendants have supplied medical records from Wilson's file. These records document Wilson's contacts with Beegle and other Wexford professionals, as well as Wilson's wrist fracture and open reduction, internal fixation surgery. Wilson's medical records show that she fell on September 23, 2017 and injured her right wrist and shoulder. (ECF No. 214 at 1-2). She had an obvious deformity of her right wrist and a limited range

---

[2] Wilson was advised at the most recent status conference that affidavits detailing medical services received or requested by other inmates were not relevant to the issue in this case, which is whether the defendants were deliberately indifferent to Wilson's serious medical needs. Those affidavits were not considered in analyzing the motions for summary judgment.

of motion. On September 29, 2017, Wilson had an open reduction, internal fixation procedure at St. Mary's Medical Center. (ECF No. 223 at 6-7). Plates, screws, and pegs were implanted to fix a right distal radius fracture with an ulnar styloid fracture. (*Id.*). On November 6, 2017, a short arm cast, which had been applied post-operatively, was removed, and Wilson was instructed to begin progressive use of her wrist. (*Id.* at 8-9).

According to the records, when Wilson was seen by Dr. Sherri Johnson on December 12, 2017, Wilson complained of knee discomfort and expressed some concern that her knee had been injured in the November incident. (ECF No. 222 at 12-13). She asked Dr. Johnson if she should use a knee brace. With respect to her wrist, Wilson stated that she believed her right wrist was "fine." (*Id.*). Wilson discussed her concerns over the recalled mesh and described having a large bulge in her abdomen that was painful. She indicated that she pressed on the bulge until she pushed it "back inside." (*Id.*).

Dr. Johnson examined Wilson, and observed the bulge described by Wilson, which Dr. Johnson diagnosed as a "small ventral hernia." (ECF No. 222 at 13). Wilson's right knee showed no effusion, erythema, or calor, although it had some resolving bruises. (*Id.*). Dr. Johnson documented mild crepitus of the knee, with a diminished range of motion, but there was no lateral laxity or anterior/posterior drawer sign. Wilson was able to walk without a limp and had no difficulty getting onto the examination table. (*Id.*). Dr. Johnson diagnosed Wilson with chronic right knee pain with a history of knee replacement. She did not feel that Wilson needed to use a knee brace at that time. (*Id.*).

On June 12, 2018, Wexford completed x-rays of Wilson's right wrist and right knee. (ECF No. 222 at 19-20). The wrist x-ray showed mild degenerative joint disease, without evidence of an acute fracture. More importantly, the x-ray confirmed that there was no displacement of Wilson's wrist and the joint was anatomically aligned. (ECF No.

222 at 19-20). Wilson's knee x-ray reflected mild osteoarthritis of the knee, but indicated that the surgical hardware from her earlier knee surgery was in place without evidence of fracture or dislocation. (Id.). Wilson's knee joint was noted to be in alignment.

Wexford also submits a series of interrogatory responses by Wilson in which she admits that the only time she was denied medical care due to a Wexford policy was on November 18, 2017. (ECF No. 201-1). Wilson further admitted that she had been told that no surgical mesh is present in her abdomen. (ECF No. 201-1 at 7).

### 4. *Analysis of Medical Care Claim*

#### i.) *Fall on November 18, 2017*

While the parties disagree about some of the facts, there are no material factual disputes that prevent summary judgment. Looking first at the objective prong of the two-part constitutional analysis, there is no disagreement about the following facts: Wilson was 56 years old at the time of her wrist fracture. She had documented hypothyroidism and depression, with a history of a hernia repair and right knee replacement. Less than two months prior to her fall on November 18, 2017, Wilson underwent an operation to correct at least two fractures of her right wrist, with the placement of screws, plates, and pegs. Wilson wore a short arm cast for six weeks post operatively and had been without the cast for only twelve days when she fell hard onto the concrete floor in LCC's cafeteria. She was observed bleeding from her mouth, with swelling of her wrist, and she complained of pain in her knee, mouth, and arm. In light of these facts, the undersigned **FINDS** that Wilson had a serious medical need on November 18, 2017 given the recency of her wrist surgery, the extent of the surgical repair, the severity of the fall, and the ensuing injuries as witnessed by inmate Wanda Patterson, all of which were evidence of a substantial *risk* of serious harm to Wilson's health. In particular, Wilson could have

rebroken her wrist or damaged the hardware in her knee at the time of the fall, and these reinjuries could have led to permanent disability or required further surgery. Obviously, the correctional officers on duty believed that Wilson needed medical attention, because they called for a medical officer on three occasions.

In regard to the subjective prong, as stated, three attempts were made by correctional officers during the day of Wilson's fall to obtain medical care for her. All three were refused for one reason or another. Wilson believes at least one of the requests was refused because of Wexford's policy regulating when inmates could be seen based on their DCR number. Wexford and Beegle dispute Wilson's contention, but the parties concede that the first time Wilson was seen for her post-fall injuries was on December 12, 2017, three weeks after the incident occurred. Again, while there are some facts in dispute as to why Wilson was not seen until December 12, 2017, these disputes do not prevent summary judgment.

Although Wilson can prove that she was denied care on the day of her fall, she has not presented any evidence that the medical personnel on duty that day were aware of the severity of her fall and, nonetheless, deliberately ignored the risk of reinjury to Wilson's wrist and knee. To the contrary, Wilson admits that, based upon her later discussions with the available care providers, she does ***not*** think they were aware of a serious risk of harm to her. (ECF No. 198 at 4). While the record indicates that Wilson was bleeding in her mouth from the broken dental plate, there is no evidence detailing what information, if any, was communicated to the medical professionals by the correctional officers. Wilson was alert and able to prepare a long and detailed grievance form on November 18, 2017, suggesting that her condition had not worsened as the day progressed. Furthermore, the

grievance form did not convey a sense of urgency.[3] There is no evidence that she was knocked unconscious in the fall, or that she experienced severe debilitating pain in either her knee or wrist in the aftermath of the fall. No correctional officer documented that Wilson's condition deteriorated during the day, or that she developed new symptoms. Wilson was not physically transferred or escorted to the medical unit by the correctional officers. Moreover, Wilson continued with daily activities, as demonstrated by her presence in the library to make copies the day after her fall. (ECF No. 3-1 at 13). According to the record, Wilson did not attend routine sick call on the following Monday, Wednesday, or Friday when her DCR number allowed for such a visit. She first attended sick call on December 6, 2017, which was eighteen days after the fall. She was examined by a physician six days later. Consequently, the undersigned **FINDS** that, given the undisputed facts, Wilson cannot establish that the defendants deliberately ignored a significant risk of harm to Wilson's health on November 18, 2017.

Moreover, while the reasons for the delay in medical care are disputed, the dispute is not one of material fact, because there is no evidence that Wilson suffered any serious consequence from the alleged delay of care. The first record of Wilson complaining of ongoing pain after the fall is dated December 9, 2017, and she was examined three days later. (ECF No. 215-1 at 68). By the time of her visit on December 12, 2017, the examination notes prepared by Dr. Johnson document that Wilson was not complaining of any issue with her wrist, and her knee showed no significant change or evidence of acute injury related to the fall. Dr. Johnson's clinical findings were corroborated by the x-rays taken of Wilson's wrist and knee in June, which reflected the absence of a new injury,

---

[3] The grievance form indicates that it contained a second page, but no second page was provided to the Court.

fracture, disturbance, or displacement of surgical hardware, and showed a normal alignment of the joints, with only mild degenerative changes. While it is true that the x-rays were not performed until seven months after the fall, the record evidence does not indicate that Wilson continued to complain of severe pain or significant impairment between her visit with Dr. Johnson on December 12, 2017 and the x-rays on June 2018. Wilson currently alleges that she has limitations of her right wrist and knee, but she offers no evidence that those limitations are related to her November 2017 fall—let alone to a delay in medical care—rather than simply being the consequences of the underlying injuries that led to her knee replacement and wrist repair in the first instance.

As Wilson has not provided evidence to establish the subjective prong of her claim, and has not shown significant harm related to the three-week delay of medical care, the undersigned **FINDS** that Wilson does not state a constitutional violation related to her November 2017 fall.

### ii.) Denial of medical equipment and aids

Wilson's claims regarding the lack of certain treatment aids—such as a knee brace, abdominal binder, heating pad, boot braces, TENS unit, B-12 shots, Menest prescriptions, muscle rub, medical shoes, Vitamin E, insoles, Preparation-H, protein powder, egg crate mattress, and over-the-counter pain medications—fail to raise an issue of constitutional proportion. In certain instances, courts have found that a correctional institution, or contractor like Wexford, violates the Eighth Amendment when it refuses to provide health-related equipment and aids to inmates with serious medical conditions. However, in those instances, the courts have first found that the equipment or aid constituted a medical necessity to the inmate in need. *See, e.g., Newman v. Alabama,* 503 F.2d 1320, 1331 (5th Cir. 1974) (finding that a failure to provide eyeglasses and prosthetic devices to

inmates in need was a constitutional violation); *Large v. Washington County Detention Center,* 915 F.2d 1564 (4th Cir. 1990) (holding that an institution's refusal to provide hearing aids to hearing impaired inmates may constitute a constitutional violation); *but see Kayser v. Caspari,* 16 F.3d 280, 281 (8th Cir. 1994) (holding that confiscation of egg-crate mattress was not a violation of the Eighth Amendment when mattress was not deemed to be medically necessary); *Koos v. Corrections Corp. of America,* 63 F. App'x 796, 797 (6th Cir. 2003) (same). Wilson has not provided any evidence that the items she claims were unavailable to her have been deemed to be medically necessary for her conditions. She contends that the absence of these items reduces the quality of her life. While that may be true, to state a constitutional claim, Wilson must establish that she has a serious medical condition requiring treatment with these items and that Wexford is deliberately indifferent to that condition by refusing to make the equipment, medication, and aids available. She has not done so.

Moreover, as Wexford and Beegle assert, there is no evidence in the record that Wilson exhausted her administrative remedies in regard to the denial of medical supplements and aids. Wilson filed no grievance challenging the unavailability of these items prior to filing the instant action, and she has not exhausted the grievance process on this subject matter. In this case, the grievance process at LCC was available to Wilson, and she was well aware of the procedure. Over the years, Wilson has accessed the system on numerous occasions and exhausted her remedies on other issues. Wilson makes no claim that the grievance process was unavailable to her, or that her concerns were ignored. Indeed, Wilson has advised the Court that many of the items previously unavailable to her have been made available since the filing of her lawsuit. For example, she has been prescribed preparation H, Vitamin B-12, tums for calcium replacement,

muscle rub, an abdominal binder, and a knee brace. (ECF Nos. 198 at 10, 215-1 at 61). She admits that the only item she is waiting to receive is a heating pad. (*Id.*).

As Wilson fails to establish that the medical aids, devices, and prescriptions about which she complains were denied to her after they were deemed necessary to treat a serious medical condition, the undersigned **FINDS** that Wilson fails to state an Eighth Amendment violation related to the lack of medical aids, devices, and prescriptions. In addition, the undersigned **FINDS** that Wilson has not exhausted administrative remedies related to this issue.

### iii.) Mesh

Wilson's claims related to recalled surgical mesh also must fail. Wilson did not exhaust administrative remedies pertaining to this issue, and she lacks evidence of deliberate indifference to a serious medical need. According to the record before the Court, other than an entry in 2010 noting that Wilson might have received recalled surgical mesh, Wilson first requested medical evaluation related to possible abdominal mesh on December 6, 2017. (ECF No. 222 at 12). On December 12, 2017, Wilson told Dr. Johnson that she had surgical mesh implanted in 1989 during a hernia repair surgery. Wilson denied having symptoms related to the repair, but stated that she had received a letter indicating that the mesh had been recalled. Wilson also believed that she was supposed to receive a second hernia repair surgery, but could not recall the exact anatomical location of the hernia. (*Id.*). Dr. Johnson examined Wilson and located a small ventral hernia that was revealed when Wilson was rising from a supine position. Otherwise, the examination was normal. (*Id.*). Dr. Johnson reviewed operative records of Wilson's 1989 surgery, as well as of a 1990 procedure, but found no mention of surgical mesh being used during the procedures. (*Id.* at 19).

27

On August 13, 2019, Wilson complained of pain, itching, and burning around her belly button, which she felt was either a bowel issue or a symptom of her abdominal mesh. (ECF No. 222 at 3). Wilson was examined by a Nurse Practitioner on August 20, 2019. (*Id.*). The nurse practitioner found a soft abdomen with normal bowel sounds and no tenderness. Wilson had some small scabbed areas on her abdomen, which were diagnosed as contact dermatitis. A cream was prescribed to treat the dermatitis.

According to the records in evidence, Wilson next complained about a bulge in her abdomen on August 29, 2019. (*Id.* at 5). The examining Nurse Practitioner felt a mass in Wilson's epigastric area that was tender when palpated. (*Id.*). Accordingly, the Nurse Practitioner ordered an ultrasound of the abdomen. The ultrasound report was inconclusive and recommended a CT scan. (*Id.*). An abdominal and pelvic CT scan was completed and showed an umbilical hernia, with no clear evidence of surgical mesh. (*Id.* at 9). Wilson was given the results and told to report to medical if the hernia protruded.

Thus, the record does not demonstrate a serious medical condition requiring immediate treatment. Similarly, there is no evidence that Wexford or its employees were deliberately indifferent to Wilson's complaint regarding the possibility of recalled abdominal mesh. Wilson's belief that surgical mesh was implanted in 1989 was not substantiated by the operative records reviewed by Dr. Johnson, and Wilson did not describe any persistent symptoms related to her prior surgery. Instead, she developed a second hernia that was being monitored by the medical unit. Wilson was given instructions to follow-up if the hernia began to protrude, and she was subsequently given an abdominal binder.

Based upon this information, the undersigned **FINDS** that Wexford and Beegle did not violate Wilson's Eighth Amendment rights in regard to her complaints about

surgical mesh. Moreover, the undersigned **FINDS** that Wilson did not exhaust administrative remedies pertaining to her alleged mesh before filing the instant action.

### iv.) Dental issues

Although Wilson has not formally added a medical claim related to her dental work, she complains that she has waited an extended period of time to receive follow-up dental care. Wilson submitted a grievance form on February 3, 2020, indicating that she had been waiting for follow-up dental care since September 2019 and believed her teeth had become infected. (ECF No. 203-2 at 21). She described having pain and sensitivity. A medical record dated January 23, 2020 confirms that Wilson was waiting for follow-up care, had a very tender mouth, and refused dental cleaning until her teeth could be extracted. (ECF No. 222 at 2). Wilson was evaluated for her dental issue at open sick call on three occasions and was advised in May 2020 that only emergency dental procedures were being performed due to COVID-19. (ECF Nos. 198-1 at 83, 215-1 at 60, 62).

While the failure to treat dental conditions may give rise to a constitutional claim, the conditions must be more serious than a transient toothache. *See, e.g., Formica v. Aylor,* 739 F. App'x 745, 756 (4th Cir. 2018) (finding that tooth decay left untreated indefinitely was likely to produce agony and more invasive and painful treatments such as a root canal or extraction and, thus, presented a serious medical condition). "Dental needs, just as medical needs, run the gamut from conditions that pose an imminent serious threat to an inmate's health to minor aches whose treatment may be ignored or delayed." *Windsor v. Amrien,* No. 3:01CV799, 2002 WL 32362033, at *4 (E.D. Va. Aug. 30, 2002, *aff'd,* 54 F. App'x 586 (4th Cir. 2003). The undisputed facts in this case do not establish that Wilson has a serious dental condition that requires immediate care and that her serious dental condition is being deliberately ignored. Wilson was seen by a dentist in

the summer of 2019 and expected to receive follow-up care from the dentist in September 2019. In October 2019, Wilson had a medical visit and denied needing any pain medication. She appeared to be in no acute distress. (ECF No. 222 at 9). Wilson additionally had medical visits in November and December 2019, and in January 2020, with no documented complaints related to her dental issues. Although Beegle apparently admitted that she dropped the ball in ensuring Wilson's follow-up treatment, the evidence simply does not support either prong of an Eighth Amendment violation. *See Royal v. Bassett,* 2008 WL 5169443, at *7 (W.D. Va. Dec. 9, 2008) (finding that inmate failed to establish deliberate indifference when there was no evidence that he suffered trauma, swelling, excessive bleeding, infection or severe, unrelenting pain as a result of his dental condition). In the absence of evidence demonstrating that Wilson is suffering severe dental pain, swelling, or infection, the undersigned **FINDS** that the delay in treating her dental condition does not, at least at this time, constitute an Eighth Amendment violation.

Accordingly, for the foregoing reasons, the undersigned **FINDS** that Wilson's motion for summary judgment against Wexford and Beegle should be **DENIED**, and the motion for summary judgment of Wexford and Beegle should be **GRANTED**.

### B.  Denial of Access to Courts—Defendants Nohe, Birdsong

In *Bounds v. Smith*, 430 U.S. 817, 821 (1977), the Supreme Court held that prisoners have a constitutional right to meaningfully and effectively access the courts. To satisfy the prisoner's constitutional right, correctional facilities have an obligation to provide adequate law libraries, or assistance from individuals trained in the law. *Bounds,* 430 U.S. at 828 (holding that prison officials must "assist inmates in the preparation and filing of meaningful legal papers by providing them with adequate law libraries or adequate assistance from persons trained in the law.") However, as the Supreme Court

later clarified, the obligation is not all-encompassing and certainly does not "guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims." *Lewis v. Casey*, 518 U.S. 343, 355 (1996).

In *Lewis*, the Court emphasized that "*Bounds* did not create an abstract, freestanding right to a law library or legal assistance." *Id.* at 351; *see, also, Murphy v. Inmate Sys. Mgmt., Inc.*, No. 1:03-0170, 2008 WL 793631, at *10 (S.D.W. Va. Mar. 20, 2008) ("[P]risoners do not have a right per se to a law library or legal assistance."). Instead, according to the *Lewis* Court, *Bounds* merely reaffirmed a prisoner's right to meaningfully access the courts. *Lewis*, 518 U.S. at 351. According to *Lewis*, "prison law libraries and legal assistance programs are not ends in themselves, but only the means for ensuring a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts." *Id.* (citation omitted). The Court added that "[t]he tools it requires to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement. Impairment of any *other* litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration." *Id.* at 355 (emphasis in original).

In addition to providing legal resources, prison officials may not actively interfere with a prisoner's efforts to access the courts. *See, e.g., Oxendine v. Williams,* 509 F.2d 1405, 1407 (4th Cir. 1975) (concluding that the confiscation of legal materials and the unavailability of writing supplies might constitute an unconstitutional interference with an inmate's right of access to the courts.); *Carter v. Hutto,* 781 F.2d 1028, 1031–32 (4th Cir. 1986) (holding that the alleged confiscation or destruction of an inmate's legal

materials relating to his petition for a writ of *habeas corpus* stated "a valid claim based on the deprivation of access to the courts, a right of vital importance to prisoners and to the integrity of our criminal justice system."). Nonetheless, a temporary deprivation of legal documents may not rise to the level of a constitutional deprivation; particularly, when there are legitimate penological reasons for the deprivation. *Lewis,* 518 U.S. at 361-62 (finding that prisoners deprived of their legal papers for sixteen days did not state a claim of constitutional significance, because the deprivation was the "product of prison regulations related to legitimate penological interests.'). To be actionable, interference with a prisoner's right to access the courts must be intentional; "negligence on the part of the defendant is not enough to state a claim." *Eversole v. NFN Curran*, No. 3:12-CV-2, 2017 WL 908201, at *2 (S.D. Tex. Mar. 7, 2017) (citing *Richardson v. McDonnell,* 841 F.2d 120, 121–22 (5th Cir. 1988) *and Snyder v. Nolen,* 380 F.3d 279, 291 n. 11 (7th Cir. 2004)) ("[A]n allegation of simple negligence will not support a claim that an official has denied an individual of access to the courts."); see also *Lewis,* 518 U.S. at 350 ("In the cases to which *Bounds* traced its roots, we had protected that right by prohibiting state prison officials from actively interfering with the inmates' attempts to prepare legal documents, or file them and by requiring state courts to waive filing fees, or transcript fees for indigent inmates.").

Furthermore, as the Supreme Court has explained, in order for a prisoner to bring a plausible claim of denial of access to courts, the prisoner must demonstrate actual injury or "that alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim." *Id*. The Court provided some examples of a plausible claim: "[A prisoner] might show, for example, that a complaint he prepared was dismissed for failure to satisfy some technical requirement which, because of deficiencies in the

prison's legal assistance facilities, he could not have known. Or that he had suffered arguably actionable harm that he wished to bring before the courts, but was so stymied by inadequacies of the law library that he was unable even to file a complaint." *Id.; see also Cochran v. Morris*, 73 F.3d 1310, 1317 (4th Cir. 1996) (recognizing that plaintiff bringing denial of access to courts claim must allege claim with specificity and identify an actual injury resulting from official conduct); *Michau v. Charleston Cty., S.C.*, 434 F.3d 725, 728 (4th Cir. 2006) (rejecting denial of access claim where complaint did "not specifically explain how [plaintiff] was injured by any limitations on his access to the law library.").

At least two federal district courts within the Fourth Circuit have rejected arguments that the right to access the courts is violated by limiting an inmate to one hour of law library time every week or every other week, where no actual harm from the time limitation is shown. *See Watts v. Johnson*, No. 7:07-cv-00323, 2007 WL 2110341, at *1-*2 (W.D. Va. July 18, 2007); *Sterling-Earl v. Gray*, No. 7:06CV00196, 2006 WL 1318367, at *5-6 (W.D. Va. May 15, 2006); *Skundor v. Painter*, No. 5:00-0463, 2002 WL 32334397, at *4-6 (S.D. W. Va. Sept. 26, 2002); *see also Benjamin v. Kerik*, 102 F. Supp. 2d 157, 164 (S.D.N.Y. 2000) ("In order for an inmate to show that the library or legal assistance program hindered his efforts to pursue a civil legal claim, he must show that he encountered more than mere delay or inconvenience."). In addition, courts have dismissed claims based on the lack of ancillary tools—such as notary services and copies— when no actual injury is shown. *See Tyler v. Byrd*, No. CV 4:16-0400-MGL-BM, 2017 WL 875859, at *3 (D.S.C. Feb. 14, 2017), *report and recommendation adopted*, No. CV 4:16-00400-MGL, 2017 WL 839535 (D.S.C. Mar. 3, 2017) (holding that lack of notary services, copies, and assistance with legal mailings are not actionable without an injury); *Deans v.*

*Lindsey*, No. C/A 3:073247-CMC-JRM, 2009 WL 436403, at *3 (D.S.C. Feb. 20, 2009) (same); *and Crouchman v. Pickens Cty. Council*, No. CV 9:16-0804-CMC-BM, 2017 WL 767185, at *14 (D.S.C. Feb. 3, 2017), *report and recommendation adopted*, No. CV 9:16-804-CMC-BM, 2017 WL 749393 (D.S.C. Feb. 27, 2017) (dismissing a plaintiff's denial of access to the courts claim when he failed to show an actual injury). Conclusory allegations are insufficient to maintain a claim based on the lack of access to courts.

### 1. *Wilson's Allegations and Motion for Summary Judgment*

Wilson claims that the interference with her right to access courts began in 2010 when she tried to file a civil rights complaint with this Court. (ECF No. 3 at 5). As a result of her efforts, Wilson claims that she was improperly charged with a disciplinary infraction by Birdsong, LCC's librarian. The alleged infraction caused Wilson to lose her inmate job in the library and led to her filing a grievance. However, the grievance process was interrupted by someone at LCC, who failed to give Wilson the Commissioner's response to her appeal. In addition, Wilson requested forms from the district court to pursue her complaint, and the forms were confiscated at the direction of Birdsong. This incident resulted in an additional disciplinary charge against Wilson for possessing contraband. The disciplinary charge was later removed from her record, but the forms were not returned to her. (*Id*. at 6).

Wilson acknowledges that she did not attempt to file another civil rights complaint until 2017. (ECF No. 3 at 7). She claims that the complaint, which was ultimately filed herein, was tampered with and portions were deleted, prompting her to file grievances related to Birdsong's overview of inmate lawsuits. Wilson accuses Birdsong of being behind the tampering and deletions and argues that she should have been prohibited from having any control over, or access to, Wilson's paperwork. Wilson's requests to have

Birdsong "excluded" from oversight were denied by LCC administration.

Wilson alleges that Birdsong and Nohe, LCC"s former Superintendent, interfered with Wilson's right to access the courts in several ways. First, Wilson contends that Birdsong purposefully deleted research, motions, and complaints prepared by Wilson, which were saved on flash drives and hard drives. Wilson states that she is required to leave her work in the custody of Birdsong, and when Wilson returns to the library to work on it, she finds that her work has been "erased or compromised." (ECF No. 198 at 12). Wilson believes that her work is being altered by Birdsong in retaliation for grievances Wilson has filed against Birdsong. Much of the foundation of Wilson's complaints against Birdsong relate to the events of 2010 and 2011. (*Id.* at 14). Presently, however, Wilson claims that Birdsong is limiting her access to the library by closing it 40% of the time it is scheduled to be open. (ECF No. 3 at 8). In addition, she asserts that Birdsong continues to tamper with her work.

Second, Wilson claims that Birdsong and Nohe conspired to increase the cost of copies to interfere with Wilson's legal filings. According to Wilson, the cost of copies was 5 cents per page. However, in November 2017, when Wilson was in the midst of copying numerous affidavits and witness lists in this case, the price of copies increased to 15 cents per page. (ECF No. 198 at 14).

Third, Wilson claims that Birdsong attempted to retaliate against Wilson by instigating a disciplinary action against her. (ECF No. 3 at 9). This action occurred in November 2017 when Birdsong filed a violation notice stating that Wilson had improperly accessed the library on a weekend day to make copies, although she knew she was not permitted to do so. (ECF No. 3 at 8-9). The disciplinary action was resolved in Wilson's favor when it was discovered that Wilson had received special permission from a prison

counselor to make the copies.

In response, the DCR defendants argue that Wilson has no evidence of her work being deleted or compromised. (ECF No. 209 at 3-4). When Wilson recently claimed that someone had tampered with her work, a computer technician was asked to investigate, and that technician, Michael Ross, found no evidence that any documents had been deleted. Indeed, he found no evidence that Wilson had created any documents on the flash drive reviewed. The DCR defendants suggest that Wilson imagined the entire episode. (*Id.* at 4).

Wilson filed a reply, but did not directly address the arguments of the DCR defendants. (ECF No. 216). Instead, she discussed having sent a letter to Senator Joe Manchin and then later discussing her concerns with a liaison from his office. (*Id.* at 2). Based upon those contacts, Wilson decided to pursue legal action, which allegedly resulted in her being the subject of harassment, retaliation, and prejudice.

### 2. DCR Defendants' Motion for Summary Judgment

The DCR defendants refute the alleged interference of Birdsong with Wilson's 2010 civil rights complaint, emphasizing that the issue initially revolved around a grievance that Wilson had appealed to the Commissioner. Wilson claimed that Birdsong interfered with the appeal. (ECF No. 206). However, Wilson never produced a shred of evidence to support her claim. Indeed, Wilson admitted at her deposition that she had no proof of the allegation against Birdsong. (*Id.* at 5). The DCR defendants note that Wilson also claimed Birdsong deleted a 2010 civil rights complaint, took blank federal court forms from Wilson's cell, and generally obstructed Wilson's right to access the courts. Again, however, Wilson provided no evidence to support her accusations. (*Id.* at 7). When Wilson made additional allegations in 2018 that Birdsong deleted Wilson's legal work, a computer

36

technician was asked to examine the flash drive on which Wilson claimed her work had been saved. The technician, Michael Ross, found no evidence of documents having been saved on the flash drive and no evidence of any deletions. (ECF No. 206 at 8).

Finally, according to the DCR defendants, Wilson's claim that Birdsong retaliated against Wilson upon learning that she intended to file the instant action is entirely baseless. Birdsong filed a violation notice against Wilson based on a complaint that she was improperly making copies in the library on a Sunday. When the violation was investigated, it was discovered that Wilson had special permission from an LCC counselor to make the copies. Consequently, the violation notice was dismissed. Nonetheless, Sallaz advised Wilson that Birdsong had the responsibility to ensure that library access was limited to the scheduled hours, and she acted appropriately in reporting the incident. (*Id.* at 8). As for the claim that Birdsong and Nohe raised the cost of copies in an effort to interfere with Wilson's legal work, the DCR defendants contend that the LCC policy was not changed because of Wilson, and in any event, does not apply to legal copies. Instead, copies of legal papers are made for free, and inmates proceeding *in forma pauperis* can request three free copies of each legal submission. (*Id.* at 9). The DCR defendants further contend that Wilson never filed any grievance related to the cost of copies. (*Id.* at 10).

In her response, to the DCR defendants' motion, Wilson refers the Court to multiple affidavits she filed from other inmates detailing issues that they have experienced in accessing and using the library, which Wilson claims are evidence of retaliation and harassment by Birdsong. (ECF No. 215 at 33). Wilson adds that she has been told by other witnesses that Birdsong reads the legal documents prepared by inmates and that Birdsong has questioned inmates about their assistance in Wilson's case. Wilson claims that it is improper for Birdsong to be involved in processing grievances and again

states that Birdsong interfered with the appeal of a grievance lodged by Wilson in 2010. (ECF No. 215 at 34). Wilson reiterates that the violation notice submitted by Birdsong when Wilson made copies in the library on a Sunday was dismissed, and she complains that Birdsong gives too much authority to inmates working as librarians.

The DCR defendants reply by noting that Wilson has never asserted any allegations in prior documents about the authority given to inmate librarians. (ECF No. 218 at 4). In any event, the DCR defendants argue, Wilson's claims are conclusory and wholly unsupported by fact. The DCR defendants add that Wilson has not responded to Birdsong's affidavit, which states that Wilson has never been charged for legal copies; therefore, Wilson apparently does not dispute the accuracy of that statement. (*Id.*).

### 3. Evidence

Wilson offers a set of documents from 2010-2011 in support of her allegations. A memorandum from Birdsong dated June 24, 2010 confirms that Wilson was given permission to be in the library and to retain in her cell legal research materials and paperwork pertaining to other inmates' cases. (ECF No. 215 at 87). On August 23, 2010, Birdsong filed a violation report concerning allegedly fraudulent information Wilson provided to Birdsong. (*Id.* at 83) Wilson subsequently pleaded guilty to the violation. (*Id.* at 84).

There is a nearly seven-year gap in the evidence related to the library. Then, on September 12, 2017, Wilson filed an Inmate Request ("IR"), asking to be able to use the law library as needed to develop her case. (ECF No. 198-1 at 51). She reissued her request to use the library on October 9, 2017, and the request was granted. (*Id.* at 45).

Wilson filed a grievance on November 6, 2017, stating that she was preparing a 1983 action and received a disciplinary infraction for possessing her own paperwork.

(ECF No. 198-1 at 168-69). The materials were confiscated, although the charge was later dismissed and Wilson was told to get her materials at the law library. When she retrieved the materials, Wilson claimed that her work had been tampered with and erased, and she filed a grievance to that effect. (ECF No. 198-1 at 168-69). She asked that the staff members involved in the incident from 2011 be excluded from participating in the resolution of her grievance. She also requested that she have security for her work. Wilson's concerns were forwarded to the appropriate supervisory staff for review and handling. (*Id.* at 168).

Wilson filed a grievance on November 20, 2017 complaining that Birdsong had questioned Wilson at length regarding legal documents she had copied over the weekend, even though Wilson had permission from the case manager to access the library. (ECF No. 215-1 at 12). Wilson stated that she felt threatened and harassed by Birdsong. The unit manager responded that Birdsong was required, as library supervisor, to ensure that inmates only accessed the library during scheduled hours, or with express permission. Therefore, the unit manager concluded that Birdsong was acting within applicable guidelines when she questioned Wilson. (*Id.*). Wilson later received a notice of a disciplinary violation over her use of the library; however, that violation was also dismissed after Wilson explained her position. (*Id.* at 92).

Wilson submitted an IR on November 21, 2017, inquiring as to why the cost of copies had increased from 5 to 15 cents per page. (ECF No. 198-1 at 182). CCIA McDaniel replied on the same day, explaining that a new operational procedure was put in place on November 16, 2017 that increased the cost of copies. (*Id.*). Wilson filed an IR on February 22, 2018 asking how to obtain copies of DCR documents to support a legal claim. The unit manager discussed the request with her. (ECF No. 198-1 at 6).

On March 8, 2018, Wilson submitted an IR asking if she could go to the library to do research on a sensitive legal matter. (*Id.* at 39). She was told that she would have to wait until the librarian returned on Monday. Wilson filed an IR on March 24, 2018, stating that she was in the process of completing a civil rights complaint, which had been erased from the library files, but the library was going to be closed for nine days and she needed to finish the complaint. (ECF No. 198-1 at 38). Wilson was given permission to spend two hours in the library in the morning and again in the afternoon. (*Id.*). She requested more time on March 30, 2018. (*Id.* at 59). Wilson complained through an IR on April 4, 2018 that she was concerned with the "supervision of [her] attempt" to file a civil rights complaint, describing the supervision as leading to confidentiality problems and due process violations. (*Id.* at 36). She was told that Birdsong was simply following DCR policy. (*Id.*). Wilson then asked for a copy of the policy, which was given to her two days after her request. (*Id.* at 35).

On April 11, 2018, Wilson sent another IR asking about the library's closure. More library IR's were submitted by Wilson on June 19, July 5, and July 12, 2018. (ECF No. 198-1 at 31-33). In response, Wilson was generally offered time in the library. Wilson filed a grievance on October 19, 2018 stating that the library was closed again. She claimed she could not get access to her hard drive because only one staff person was permitted to access the drive. (*Id.* at 161). Sallaz answered that he would make arrangements for more than one staff member to access the hard drive of the library computer. Wilson filed a similar grievance on November 7, 2018, and again Sallaz accommodated her. (*Id.* at 150, 151).

On June 10, 2019, Wilson filed a grievance complaining that her attempts to meet court deadlines were being thwarted by Birdsong and inmate staff. (ECF No. 198-1 at 171,

172). According to Wilson, Birdsong held numerous meetings and provided clarifications of the rules governing the law library in an effort to interrupt Wilson's work on her civil rights complaint. She claimed that her legal work was being compromised, and that she was being retaliated against for filing the complaint. She stated that her work had been repeatedly lost and read. She recounted an incident in which another inmate had possession of Wilson's legal documents ostensibly to deliver them to Wilson at Birdsong's request. (ECF No. 198-1 at 100). Wilson claims that the inmate was able to see a witness list prepared by Wilson, as well as investigative documents.

Wilson filed an IR for library access on June 11, 2019, indicating that she had a time sensitive case and needed access. (*Id.* at 27). Sallaz met with Wilson on June 13, 2019 and assured her that her access would be allowed. (*Id.* at 171).

Wilson was deposed in this action on June 16, 2020. (ECF No. 203-3). Of relevance to her claim that Nohe and Birdsong interfered with her right to access the courts, Wilson testified that her problems with Birdsong began in 2010 when Wilson was working in the law library. (ECF No. 203-3 at 7-8). Birdsong became irritated with Wilson for helping too many people with legal filings, because Birdsong did not like all of the traffic in the library. (*Id.*). Birdsong eventually told Wilson to stop bringing people to the library and to conduct her business with them outside. (*Id.* at 9). Wilson conceded that she did not know whether Birdsong was aware in 2011 that Wilson was working on a civil rights case, and Wilson did not attempt to file the suit until 2018. (*Id.* at 10, 13). Wilson testified that in 2017, she requested forms from the district court to begin a new complaint. (*Id.* at 14). Birdsong displayed the same irritation in 2018 when Wilson decided to resurrect her civil rights lawsuit.

With regard to Nohe, Wilson could not say whether Nohe intentionally interfered

with Wilson's right to access the courts. (ECF No. 205-8 at 16). Wilson further admitted at her deposition that she had no evidence that her paperwork was intentionally destroyed in 2011. Moreover, when her paperwork was confiscated in 2011 and never returned, she did not file a grievance over the lost paperwork. (ECF No. 205-8 at 20). Wilson testified that she also refrained from filing a grievance over the price increase for copies, because you have to "pick[] and choose your battles." (*Id*. at 21). Wilson maintained in her deposition, however, that Nohe intentionally discouraged the inmates from filing grievances by threatening to lock them down. (ECF No. 203-3 at 14).

The DCR submitted several additional pieces of information, including an affidavit from Birdsong in which she denies interfering with Wilson's legal work and grievances, and denies retaliating against her. (ECF No. 205-10). Birdsong denies having anything to do with the grievance appeal response that Wilson claims went missing in 2011 and states that she had no recollection of Wilson attempting to file a federal lawsuit that year. Birdsong recalls Wilson claiming in 2017 that someone tampered with her legal work in the instant matter, but that allegation was debunked by an IT technician, who found no evidence of deletions on the thumb drive storing Wilson's work. Birdsong admitted that the law library at LCC is not open all of the time, but states that there is a law library annex, which is a computerized resource center, and it is open all day, every day. (ECF No. 205-10).

In addition to Birdsong's affidavit, the DCR defendants offer the affidavits of Nohe and Michael Ross, the technician who examined Wilson's thumb drive for deletions. Nohe also denies Wilson's allegations, specifically stating that she had no involvement in the alleged difficulties Wilson had with her draft complaint in 2010-2011, and that she never instructed Birdsong to interfere in the grievance process. (ECF No. 205-27). Ross verifies

that he examined a thumb drive, which Wilson alleged had been tampered with, and could find no evidence to substantiate her allegations. (ECF No. 205-11). Ross confirms that he would have found evidence of deletions, if deletions had occurred.

LCC's Operation Policy No. 3.30 was provided. (ECF No. 205-14). The policy reviews the law library's hours of operation, available materials, rules of behavior, and supervision. The policy confirms that each inmate is permitted to make, at no charge, three copies of any motion, paper, brief, or other legal action, which the inmate intends to file with a court. (*Id*). The policy explains the law annex and details how an inmate can request access to the annex.

### 4. *Analysis of Denial to Access Courts Claim*

Wilson's allegations of denial of access to courts begin in 2010-2011. Generally, in an action brought under 42 U.S.C. § 1983, the statute of limitations is determined by the law of the State in which the action is brought. *Wallace v. Kato*, 549 U.S. 384, 387 (2007) ("Section 1983 provides a federal cause of action, but in several respects relevant here federal law looks to the law of the State in which the cause of action arose. This is so for the length of the statute of limitations: It is that which the State provides for personal-injury torts.") (citing *Owens v. Okure,* 488 U.S. 235, 249–250 (1989); *Wilson v. Garcia,* 471 U.S. 261, 279–280 (1985)). "Where state law provides multiple statutes of limitations for personal injury, courts considering § 1983 claims should borrow the general or residual statute for personal injuries." *Owens,* 488 U.S. at 249-50. In West Virginia, the residual statute of limitations for a personal injury claim is two years. *See* W. Va. Code § 55-2-12(b) (providing that "[e]very personal action for which no limitation is otherwise prescribed shall be brought ... within two years next after the right to bring the same shall have accrued if it be for damages for personal injuries[.]"). Therefore, a two-year

limitations period is typically applied to claims filed in this district asserting Eighth Amendment violations. *See, e.g., Haynes v. Jimenez*, No. CIV.A. 5:05-CV-00820, 2008 WL 565028, at \*7 (S.D.W. Va. Feb. 29, 2008).

Although state law governs the limitations period, federal law determines when the cause of action accrues, thus triggering the running of the limitations period. *Wallace,* 549 U.S. at 388. "A civil rights claim accrues when the plaintiff knows or has reason to know of the injury which is the basis of the action." *See A Society Without a Name v. Virginia*, 655 F.3d 342, 348 (4th Cir. 2011) (quoting *Cox v. Stanton*, 529 F.2d 47, 50 (4th Cir. 1975)) (internal quotation omitted). In the case of a "continuing violation," the statute of limitations does not begin to run until the wrongdoing ceases. *Patrick v. Sharon Steel Corp.,* 549 F. Supp. 1259, 1264 (N.D.W. Va.1982) ("Where a tort involves a continuing or repeated injury, the cause of action accrues at, and limitations begin to run from the date of the last injury, or when the tortious overt acts cease."). The "continuing violation" doctrine applies to prisoner complaints asserting constitutional infringements. However, to trigger this doctrine, the prisoner must show that at least one injurious act fell within the two-year period prior to the filing of her complaint. *Graham v. Taylor,* 640 F. App'x 766, 769 (10th Cir. 2016). Moreover, the defendant's actions must be "more than the occurrence of isolated or sporadic acts." *Cowell v. Palmer Twp.,* 263 F.3d 286, 292 (3d Cir. 2001); *Gonzalez v. Hasty*, 802 F.3d 212, 220 (2d Cir. 2015) (holding that the continuing violation doctrine "applies not to discrete unlawful acts, even where those discrete acts are part of a 'serial violation,' but to claims that by their nature accrue only after the plaintiff has been subjected to some threshold amount of mistreatment.'").

Here, Wilson's claims pertaining to occurrences in 2010 and 2011 are barred by the applicable two-year statute of limitations, because they were discrete acts rather than

part of a continuing violation. Even assuming the 2010/2011 acts could be construed as the beginning of a continuing violation, they are still barred as Wilson has not demonstrated that the defendants denied her access to courts within the two years prior to the filing of this action. The evidence, which is not in dispute, shows that Wilson initiated the process of preparing a civil rights complaint in 2010; however, she decided to forgo a lawsuit at that time. In 2017, she again took steps to initiate a civil rights case in this Court and ultimately filed a complaint in May 2018. (ECF No. 3). As the docket sheet reflects, Wilson has been a prolific filer in this action. Clearly, the defendants have not impeded Wilson's access to the courts in relation to this civil action.

Although Wilson complained repeatedly about the law library not always being open, her grievances were generally resolved in her favor. Moreover, there is no evidence to establish that Wilson suffered any harm from the periodic closures of the library. She was never sanctioned in this case for untimely submission of documents and was given additional time as needed.

In regard to her claim about the increase in copying charges, Wilson has not provided any evidence that the policy was changed institution-wide in an effort to interfere with her access to the courts. Furthermore, the DCR defendants submitted an affidavit and policy demonstrating that Wilson has not been charged for copies related to her legal work. Wilson does not refute the accuracy of the affidavit or policy. Finally, Wilson admittedly did not exhaust administrative remedies in regard to the change in copy charges.

As Wilson cannot show any harm flowing from the problems she has experienced in accessing the library or from the increase in copying charges, the undersigned **FINDS** that Wilson fails to state a claim of denial of access to the court which can withstand

summary judgment in favor of the defendants. The undersigned further **FINDS** that Wilson did not exhaust administrative remedies related to the increased copy charges.

### C. Retaliation—Defendants Nohe, Birdsong, Spencer, Ball, Rider, Davis

It is well-settled that "[a]n action motivated by retaliation for the exercise of a constitutionally protected right is actionable, even if the act, when taken for a different reason, might have been legitimate." *Martin v. Duffy*, 977 F.3d 294, 306 (4th Cir. 2020) (quoting *Woods v. Smith*, 60 F.3d 1161, 1165 (5th Cir. 1995)). To state a claim for retaliation under § 1983, a plaintiff "must allege either that the retaliatory act was taken in response to the exercise of a constitutionally protected right or that the act itself violated such a right." *Adams v. Rice,* 40 F.3d 72, 75 (4th Cir. 1994). "Retaliation, though it is not expressly referred to in the Constitution, is nonetheless actionable [under § 1983] because retaliatory actions may tend to chill individuals' exercise of constitutional rights." *Am. Civil Liberties Union v. Wicomico Cty*., 999 F.2d 780, 785 (4th Cir. 1993) (citing *Perry v. Sindermann,* 408 U.S. 593, 597 (1972)).

A First Amendment retaliation claim contains three essential elements that a plaintiff must establish, including that: (1) he engaged in protected First Amendment activity; (2) the defendant took some action that adversely affected his constitutionally protected speech; and (3) a causal relationship existed between plaintiff's speech and the defendant's retaliatory action. *Martin*, 977 F.3d at 299 (citation omitted). A plaintiff suffers adverse action "if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of [the protected] rights." *Martin v. Duffy,* 858 F.3d 239, 250 (4th Cir. 2017). Causation is established through a burden-shifting analysis. "Once a plaintiff establishes his protected conduct was a substantial or

motivating factor in the defendant's decision to take adverse action, the defendant is appropriately tasked with explaining why her decision was not animated by retaliatory motives." *Martin,* 977 F.3d at 301. To demonstrate a causal connection, "a plaintiff in a retaliation case must show, at the very least, that the defendant was aware of [him] engaging in protected activity." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 501 (4th Cir. 2005). Furthermore, "[i]t is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must cause the injury. Specifically, it must be a 'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019); *also Martin,* 977 F.3d at 300 (explaining that a claim of retaliation is defeated if the defendant carries his burden to show by a preponderance of the evidence that the same action would have been taken in the absence of protected conduct.).

The Fourth Circuit has held that inmates do not have "a constitutional entitlement to and/or due process interest in accessing a grievance procedure," but they nonetheless have "a First Amendment right to be free from retaliation when they do file" a grievance. *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 542 (4th Cir. 2017). In addition, "[r]etaliation against an inmate for the exercise of his right to access the courts states a cognizable claim." *McFadden v. Lewis*, 517 F. App'x. 149 (4th Cir. 2013) (citing *Hudspeth v. Figgins,* 584 F.2d 1345, 1347–48 (4th Cir. 1978)). This remains the case even if the act would have been proper if taken by the prison official for other reasons. *Id.* (citing *Am. Civ. Liberties Union,* 999 F.2d at 785). To state a retaliation claim in this context, a plaintiff "must allege sufficient facts to warrant concern that the alleged retaliation might have a chilling effect on the exercise of the right to access the courts and show that he suffered more than de

minimis inconvenience." *Id.* at 150 *(citing Am Civ. Liberties Union,* 999 F.2d at 785–86 & n.6.). The plaintiff need not demonstrate that the retaliatory act prevented his access to the court, only that it was intended to have that effect "and was reasonably calculated to have that effect." *Id.* (citing *Hudspeth,* 584 F.2d at 1348). "The prisoner need not succumb entirely or even partially to the threat; it is sufficient that the retaliation was intended to limit the prisoner's right of access to the court." To carry his burden, a plaintiff must allege specific facts, as "bare assertions of retaliation do not establish a claim of constitutional dimension." *Adams,* 40 F.3d at 74–75. "Generally in this circuit, inmates' claims of retaliation are "treated with skepticism because 'every act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds directly to prisoner misconduct.'" *Cochran v. Morris*, 73 F.3d 1310, 1317 (4th Cir. 1996) (quoting *Adams*, 40 F.3d at 74).

Both statutory and common law provide prison officials with broad discretion over an inmate's "location, variations of daily routines, changes in conditions of confinement (including administrative segregation), and the denial of privileges" *Gaston v. Taylor*, 946 F.2d 340, 343 (4th Cir. 1991); *see, also*, W. Va. Code § 25-1-1, *et seq.* A change in the location or condition of a prisoner's confinement that does not exceed the scope of the original sentence gives rise to a constitutional claim only if it "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Connor*, 515 U.S. 472, 484 (1995); *also Slezak v. Evatt*, 21 F.3d 590, 594 (4th Cir. 1994) ("The federal constitution itself vests no liberty interest in inmates in retaining or receiving any particular security or custody status '[a]s long as the [challenged] conditions or degree of confinement … is within the sentence imposed … and is not otherwise violative of the Constitution.' ") (citation omitted). Evidence that an inmate was fired from a prison job or was denied other inmate privileges in retaliation for her exercise

48

of First Amendment rights, however, is sufficient to support a plausible claim under § 1983. *Patel v. Moran*, 897 F. Supp. 2d 389, 400 (E.D.N.C. 2012) (citing *Hudspeth v. Figgins,* 584 F.2d 1345, 1348 (4th Cir. 1978)).

### 1. Wilson's Allegations and Motion for Summary Judgment

Wilson claims that Birdsong was angry about Wilson's efforts to file a civil rights action and retaliated against her by preventing her access to the library and library resources and by filing unwarranted disciplinary charges against her. (ECF No. 3 at 9). Wilson claims Nohe harassed and retaliated against inmates, including Wilson, for filing grievances. (ECF 198 at 17). Wilson further contends that Nohe was prejudiced against her, because Nohe was connected to the family of Wilson's murder victim. Wilson believes that she was removed from LCC's Paws4People program at Nohe's request, and that Nohe assisted the victim's family in resisting Wilson's efforts for parole in 2010. (ECF No. 3 at 9-10, 21). Wilson also believes that Birdsong, who employed Wilson in the library in 2010, began to treat her badly because Birdsong learned about Wilson's crime and sympathized with the victim's family. (*Id.* at 11).

Wilson also accuses Spencer, a correctional officer, of retaliation, stating that Spencer singled her out and humiliated her. Wilson states that she and Spencer had disagreements in the past, and Wilson tried to keep her distance from Spencer. According to Wilson, on May 7, 2018, Spencer performed an unjustified and lengthy search of Wilson's cell, during which Spencer damaged and confiscated property belonging to Wilson. (ECF No. 7). Wilson notes that the search, which was unusually long and thorough, was done just a few days after she filed the instant action. (ECF No. 94 at 2). Wilson claims that her religious altar was disrespected, and her prayer rug was damaged in the search. Personal items were taken by Spencer and thrown away, including arts and

crafts projects on which Wilson was working. (ECF Nos. 8, 94 at 2). Wilson accuses Spencer of doing unnecessary strip searches on inmates in order to collect gossip about other inmates whom she can then target. (ECF No. 94 at 2). In addition, when Wilson was recuperating from wrist surgery, Spencer tried to deter Wilson from attending classes and participating in activities, even though other inmates with similar medical conditions were permitted to attend them. (*Id*. at 3). Wilson further complains that, after filing the complaint herein, she was moved from a single cell to a double cell with an individual who "does not have many morals and values and no respect for authority or her fellow inmate." (ECF Nos. 6; 7 at 2; ECF No. 198-1 at 115-19). She claims that her transfer "once again shows someone within the institution appears to be once again retaliating against [her]." (ECF No. 198-1 at 115-19). She adds that she was forced to move her own mattress although she has a lifting restriction.

With respect to Ball, Rider, and Davis, Wilson claims that Davis, a kitchen supervisor employed by LCC's food service prison contractor, Aramark, prepared Wilson's kosher food in a contaminated kitchen, and did this to retaliate against her. She claims the defendants have repeatedly and blatantly disrespected her religious beliefs. (ECF Nos. 9, 15, 18, 94 at 4). Wilson contends that Ball, who is LCC's Associate Superintendent of Operations, overlooked the evidence of contamination, thus allowing Davis and other Aramark employees to denigrate Wilson's religion. (ECF No. 94 at 5). She also claims that Ball ordered the kitchen staff to refuse Wilson milk and dairy products, and he has altered her meal menu to the extent that her diet is unhealthy and undesirable. (ECF No. 3 at 20). Wilson additionally claims that Rider, who is Director of Inmate Services and Activities, participated in arranging her diet and reassured her that the kitchen staff was abiding by kosher protocols in preparing her food, although they were

not doing so.

In a supplemental pleading, Wilson alleges that her legal mail was opened, copied, and slid under her door, which she believes was done to harass and retaliate against her. (ECF No. 26). The mail actually was not legal mail, but was correspondence from the insurance carrier of the DCR defendants. Wilson states that when she complained about the breach of her privacy related to legal mail, she was "reprimanded," because the correspondence was not clearly marked as legal mail. Wilson holds Ball responsible for this alleged breach on the ground that he was the administrative liaison over the mailroom. (ECF No. 94 at 4). She adds that the mailroom has been permitted to wrongfully withhold her copies of Popular Science magazine and also lost a diploma case she ordered years ago. (ECF No. 94 at 5).

In response to Wilson's motion, the DCR defendants argue that Wilson's claims of retaliation are entirely unsupported by evidence. (ECF No. 209 at 6). The DCR defendants emphasize that Wilson makes conclusory allegations without factual underpinnings. They concede that Spencer performed a search of Wilson's cell, but state that the search was not retaliatory. Instead, the search was prompted by a complaint from Wilson's roommate, who alleged that Wilson was storing bottles of her own urine in the cell. Similarly, the DCR defendants contend, Spencer did not interfere with Wilson's participation in activities as a form of retaliation. To the contrary, Wilson was on temporary "lay-in" status at the time she tried to attend an educational class, so by policy, she was not permitted to be in the class. Adhering to policy, Spencer prohibited Wilson on one occasion from attending an independent studies reading. (*Id.* at 7).

In addition to her vague and conclusory allegations against Nohe and Spencer, the DCR defendants note that Wilson's claims against Ball related to the mail, the cooking of

kosher food, and the lack of dairy products in her menu are without merit. They argue that Ball had no personal involvement in any of the alleged wrongdoings, and when he learned of Wilson's complaints, he attempted to remedy the situations. The DCR defendants add that Ball investigated Wilson's allegations about the kosher kitchen and ensured that the employees followed DCR policy. Wilson admitted in her deposition that she did not believe anyone intentionally contaminated her food, and she has no evidence that Ball had intent to retaliate or discriminate against her. (ECF No. 209 at 6). The DCR defendants note the same absence of evidence that Ball had any personal involvement in the alleged lack of medical care Wilson claimed, and add that she offers only conclusory statements as evidence of her claims of retaliation.

Likewise, the DCR defendants contend that Wilson has not produced any evidence to support her claims that Rider mishandled her religious diet and is responsible for the contamination of the kosher kitchen. To the contrary, Rider fully investigated Wilson's concerns regarding the kitchen and found no evidence of intentional contamination. (*Id.* at 8). The DCR defendants indicate that Wilson is voluntarily on a soy allergy religious diet and receives the food on that diet. As no customized diet is made for any inmate, there is no evidence that Rider retaliated against Wilson by limiting her to the items on her official diet plan.

### 2. DCR Defendants' Motion for Summary Judgment

The DCR defendants move for judgment on behalf of Birdsong, Spencer, Nohe, Ball, and Rider based largely upon the lack of evidence demonstrating that these individuals retaliated or harassed Wilson. (ECF Nos. 205, 206). Starting with Birdsong, the DCR defendants examine the various grievances and incident reports concerning the library and argue that Wilson takes routine events and, without any evidence, interprets

them as acts of retaliation. Indeed, Wilson admitted at her deposition that she had no proof that Birdsong interfered with her grievances or intentionally lost or confiscated paperwork. (ECF No. 206 at 7). After Wilson alleged that Birdsong had deleted Wilson's civil rights complaint, a IT technician was called to the library to examine the flash drive belonging to Wilson and found no evidence of deletions. Despite the findings of the technician, Wilson continued to claim that her work had been erased. The DCR defendants reject Wilson's assertion that Birdsong filed a disciplinary violation against Wilson in retaliation for the instant lawsuit, pointing out that when Wilson established that she had permission to be in the library, the violation was dismissed. (*Id* at 8). The DCR defendants contend that Wilson's claim regarding the increased cost of making copies is another example of her proclivity to dramatize a routine event and infer retaliation. In particular, the DCR defendants point out that Wilson has never paid the increased rate, because there is no fee for copies of legal work. (*Id*. at 9-10).

In regard to Spencer, the DCR defendants assert that Wilson's retaliation claim can be distilled to a criticism that Spencer was inconsiderate and disrespectful when she conducted a search of Wilson's cell. Wilson admitted at her deposition that Spencer did not take any of Wilson's religious materials, and the evidence indicates that items taken were contraband. Witnesses have also confirmed that the cell search was performed only after the DCR defendants received complaints about Wilson keeping unacceptable items in her cell. (*Id*. at 11-12). The search was initiated by another correctional officer, Adkins, and was completed by Spencer when Adkins had to conduct an inmate count. (*Id*. at 12). The only other complaint against Spencer relates to a single episode in which Spencer prohibited Wilson from attending an independent studies reading, but that was done because Wilson was medically prohibited from attending the reading. (*Id*. at 13).

The DCR defendants indicate that Wilson's claim that Ball and Rider prevented Wilson from having dairy products is unfounded. (Id. at 17). The DCR defendants argue that the evidence demonstrates that Wilson was on a "soy allergy religious special diet" due to Wilson's soy allergy and diet request. That particular diet does not include dairy products, and Wilson was advised of this fact. Wilson has two options if she wants dairy products: she can buy them at the commissary or change her diet request. (ECF No. 206 at 17). Wilson has chosen not to withdraw from the soy allergy religious diet and has never filed a grievance against Ball or Rider alleging retaliation. The DCR defendants cite the same lack of evidence for Wilson's claim that her food was contaminated "in retaliation." They emphasize that Wilson has only identified four isolated occurrences since 2007 in which the kitchen staff ignored DCR policy regarding kosher meal preparation. Neither Rider nor Ball had any personal involvement in the isolated occurrences, and Wilson's complaints were fully investigated. Deficiencies in the process were corrected and the kitchen staff was re-educated. (Id. at 13-18).

Finally, as to Nohe, the DCR defendants contend that Wilson was unable to provide even a shred of evidence at her deposition that Nohe had retaliated against Wilson. (Id. at 19). Wilson could not articulate any action taken by Nohe to prevent Wilson from accessing the courts, or to interfere with Wilson's activities for a retaliatory purpose. Wilson's claims that Nohe improperly influenced the parole board against Wilson, sided with the victim's family, or had Wilson removed from the Paws4People program have no factual foundation and certainly are not evidence of retaliation.

In response, Wilson asserts that Nohe was escorted off the grounds in May 2016 and removed from her position at LCC, which, in Wilson's mind, is proof that Nohe retaliated and harassed inmates. (ECF No. 215). Wilson claims that she can offer many

witnesses to Nohe's attempts to silence the inmates from filing grievances. Wilson claims that Nohe made Wilson leave the Paws4People program in 2013, because Nohe did not want Wilson to remain in the program. (ECF No. 215 at 41-42). Wilson discusses vague episodes of mass punishment by Nohe in which she intimidated and threatened the inmates.

As to Spencer, Wilson reiterates that Spencer "singled" her out, humiliated and harassed her, and threatened to file false disciplinary charges against her. (*Id.* at 42). Wilson states that Spencer made a point of prohibiting her from attending an educational session after Wilson broke her wrist, but did not take the same action against another inmate who also had a broken arm. Wilson speculates that Spencer treats Wilson badly because Nohe had prejudiced Spencer against Wilson. According to Wilson, Nohe was connected to the family of the man that Wilson murdered and made her distaste for Wilson clear. Wilson denies having urine in her room, as alleged by the DCR defendants, and concludes that the "unprofessional" cell search conducted by Spencer is another example of prejudice against her. (*Id.* at 43).

### 3. Evidence

Wilson filed an inmate grievance form and an IR in October and November 2016, complaining that she had not received a proper Wiccan festival meal. (ECF No. 198-1 at 52-53, 162-63). Wilson believed that she was being discriminated against, because she was the only one who did not receive the meal. She was told that she would be provided with a replacement dinner. On September 11, 2017, Wilson filed an IR inquiring as to why her diet had changed from a religious diet to a soy allergy diet. (*Id.* at 69). Chaplain Morrow explained that once her allergies were reported, the medical unit became responsible for her diet, and she was no longer on a religious diet. When Wilson

complained, the Chaplain told her that central office would prepare a soy allergy religious diet plan for her. Wilson filed an IR asking to attend yoga teacher training on October 10, 2017. (ECF No. 198-1 at 64). LCC personnel approved the request, but stated that Wilson should not engage in physical activity and should limit her participation to meditation. (*Id.* at 64). On November 19, 2017, Wilson submitted an IR to the Chaplain inquiring about her diet. (ECF No. 3-1 at 36). Chaplain Morrow responded, advising Wilson that she had been moved from a Kosher diet to a soy allergy religious diet. On December 20 and 21, 2017, Wilson asked for a copy of the soy allergy religious diet so she could decide if she wanted to attend meals. (ECF No. 198-1 at 76-78). Wilson filed an IR on January 10, 2018, complaining that she found meat in her food. (*Id.* at 75). Chaplain Morrow spoke with the kitchen supervisor, who apologized and said it would not happen again. On January 29, 2018, Wilson sent an IR to Chaplain Morrow, asking for the soy allergy religious diet menu and inquiring as to whether she would receive milk on the diet. (*Id.* at 74). He replied that he was still waiting to hear from the central office. Wilson submitted another IR on April 4, 2018, expressing her concern over Birdsong's supervision of Wilson's § 1983 complaint. (*Id.* at 36). She was told that Birdsong was simply following operational policy.

Wilson filed an inmate grievance on May 9, 2018 regarding a search of her cell performed two days earlier by Spencer. (ECF No. 198-1 at 156, 166). She claimed that she returned from a yoga teacher graduation ceremony to find her cell being searched by several correctional officers, including Spencer. The search took one and one half hours and resulted in her religious items being disrespected, destroyed, or confiscated, and her cell left in a shambles. Wilson stated that Spencer had verbally harassed her in the past, causing Wilson to avoid contact with Spencer. Wilson accused Spencer of deliberately

56

assuming control of the search from another officer and then making it a point to do an exhaustive examination of Wilson's belongings. According to Wilson, Spencer belittled Wilson's religious items, made sarcastic and unprofessional remarks, and threw Wilson's prayer rug on the floor, covering it with other items, including a typewriter, which damaged the rug. (ECF No. 198-1 at 156). Spencer also confiscated and threw out cards that Wilson had made for her mother and son and took a small sea shell given to Wilson by her grandfather before he passed away. Wilson indicated that Spencer coerced her into allowing some items to be destroyed by threatening her with a disciplinary violation for contraband. The unit manager responded to the grievance, stating that the length of the search was related to the amount of personal property in the cell; the sea shell was contraband; Wilson had items in her cell that should not have been there; and her prayer rug was examined and found to be in good condition. (*Id.* at 155). Wilson appealed the response to the Commissioner, contending that she was in compliance with prison policies and did not understand why the officer threw away her arts and crafts. (ECF No. 215-1 at 115).

On June 12, 2018, Wilson submitted an IR, asking to be able to purchase protein powder since the kitchen was denying her milk, cheese, and butter. (ECF No. 198-1 at 71). On June 26, 2018, Wilson submitted a grievance form alleging that the kosher area of the kitchen had been contaminated the day before when a kitchen worker used the kosher area to prepare pork. (*Id.* at 137). Wilson provided an attachment with the grievance that described four occasions on which the kitchen had not followed proper kosher protocol: November 19, 2017, January 10, 2018, June 20, 2018, and June 25, 2018. She was told in response that the grievance had been reviewed with the kitchen supervisor; the kosher area had been disinfected; and kitchen staff had been re-educated. The situation

continued to be monitored. (*Id.* at 137). Wilson renewed her grievance concerning kosher protocols on July 17, 2018. (*Id.* at 139-40). She was told that Ball had addressed the situation with the kitchen staff. Wilson wrote letters to Investigator Ramey, Susan Harding, and Della Huddleston in July and August 2018 concerning the June 2018 contamination of the kitchen's kosher area. (ECF No. 198-1 at 104, 107). She claimed that the incident in the kitchen was "retaliation," although she did not specify for what reason. Rider responded in August, advising Wilson that there was no evidence of deliberate contamination by the kitchen workers. (*Id.* at 108). Wilson also supplies documents, including affidavits, confirming that kosher protocols were not followed in June and stating that Wilson had received meat in her food on several occasion, despite being a vegetarian. (*Id.* at 141-47).

In an IR filed on August 17, 2018, Wilson asked if she could purchase dairy products, and the Chaplain answered that she could purchase any items not restricted by her religious beliefs. (*Id.* at 70). Wilson filed an IR on September 5, 2018, followed by a grievance and note to Sallaz on September 7, 2018, complaining that her legal mail was copied by the mailroom and the original was not given to her. (*Id.* at 149, 105, 180). The mail consisted of correspondence from the DCR defendants' insurance company. The unit manager explained in response that the mail was not properly marked as legal mail and was therefore handled as general mail. (*Id.* at 29). Wilson replied to the unit manager, requesting the original letter. Sallaz additionally answered, advising Wilson that she would receive the original correspondence, and the mailroom would contact her in the future if the insurance company wrote to her again. She then sent a letter to the insurance company's representative, reporting that the mailroom violated her rights and asking for a new copy of the letter. (*Id.* at 111). On October 4, 2018, Wilson filed a grievance related

to being denied a legal telephone call. (*Id.* at 148). In the response, Wilson was told that various units were on lockdown due to an open house visitation and that she could make her telephone call later.

On February 26, 2019, Wilson submitted an IR, stating that she had purchased protein powder for many years, but had not been able to do so for the last year, because the powder was no longer available. She asked if she could purchase it again given that she did not receive enough protein through her prison diet. She was told by Beegle that the protein powder was not medically necessary. (ECF No. 198-1 at 21).

On January 1, 2020, Wilson filed a grievance stating that she was being retaliated against and was the victim of harassment and discrimination by a "small core group of individual employees" of the DCR. (*Id.* at 159). The grievance was forwarded to the central office, and the central office sent Wilson a memorandum asking for more information. (*Id.* at 158). Wilson wrote to the central office on February 17, 2020, indicating that the Assistant Superintendent of Security at LCC had intervened and resolved the issue. (ECF No. 215-1 at 25). The central office confirmed by memorandum to Wilson that, in view of her letter, the matter was considered resolved.

Wilson submits the affidavit of Beverly Magnum, another inmate, who stated that she broke her arm while working in the kitchen, but was still able to participate in activities. (ECF No. 94 at 19-20). Wilson also supplies affidavits of inmates Carla Adkins, Amy Cobb, and Jessica Woods, who confirm that the search of Wilson's cell took an extended period of time and that the cell was left in a shambles. Ms. Woods, who was Wilson's roommate, also confirms that the cell search occurred after she made complaints about Wilson. (*Id.* at 16-18, 21-25). Wilson tenders additional affidavits of several inmates who corroborate the incidents on which Wilson received meat in her food, or observed

the kitchen staff violating kosher food preparation standards. (ECF No. 15 at 10-13).

The DCR defendants supply evidence in the form of deposition testimony and affidavits. Birdsong files an affidavit in which she explains that the increase in copy prices was a DCR policy change that had nothing to do with Wilson. Birdsong adds that inmates still get three copies of legal work for free, and indicates that Wilson had never paid for any of the copies she made for legal proceedings. (ECF No. 205-10).

Spencer also submits an affidavit refuting Wilson's claims of retaliation, noting that she had no reason to retaliate against Wilson. (ECF No. 205-15). Cassandra Harper, a corporal at LCC, files an affidavit stating that she assisted Spencer with the search of Wilson's cell. (ECF No. 205-17). Harper testifies that the search was conducted after they received a complaint from another inmate, who accused Wilson of storing human urine in her cell. During the search, Harper did not observe Spencer improperly handling, seizing, or disposing of Wilson's property.

Nohe executed an affidavit, denying that she retaliated against Wilson at any time during the period of Nohe's employment at LCC, which ended in 2016. (ECF No. 205-27). Nohe states that she never prohibited any inmate from filing a grievance and denied intimidating inmates to prevent grievances. Ball also files an affidavit, explaining that Wilson's diet is not restricted as a form of retaliation; rather, she is on a soy allergy religious diet to accommodate her religious beliefs and her allergy to soy. (ECF No. 205-23). Ball confirms that this diet does not include eggs, milk, and cheese, but Wilson can purchase those items. He adds that Wilson is on the soy allergy religious diet by choice. (*Id.*). As to her complaints about protein powder, the DCR defendants attach a memorandum from Chaplain Morrow to Wilson, dated June 14, 2018, explaining that the medical unit did not believe her protein levels were low enough to require

supplementation, and LCC did not offer protein powder for purchase. (ECF No. 205-24).

Rider confirms in his affidavit that Wilson voluntarily follows the soy allergy religious diet, which does not include dairy products. (ECF No. 205-25). He testifies that the DCR does not offer customized diet plans, so if Wilson wants to remain on that diet, she will not receive dairy products unless she chooses to purchase them. He indicates that the diet was not created to retaliate against Wilson and every DCR inmate on the soy allergy religious diet receives the same food as Wilson. Rider points out that Wilson could opt to withdraw from the diet at any time. (*Id.*).

With respect to Wilson's deposition, the DCR defendants attach portions of Wilson's testimony in which she admits that her prayer rug was not confiscated during the cell search by Spencer. (ECF No. 205-8 at 8). Wilson also concedes that the alleged wrongful disciplinary charges brought against her were dismissed. (ECF No. 203-3 at 14). She testified that Spencer is rude and nitpicky and treats Wilson poorly, because Spencer does not like the crime that Wilson committed. (*Id.* at 26-27). Wilson claimed that Spencer wanted to charge Wilson for having contraband in her cell, but the shift commander let Wilson throw away the contraband, including the small sea shell from her grandfather.

When asked about her allegations related to dietary restrictions, Wilson testified that she was not certain if the decision to deny her milk, cheese, and eggs was based on religious discrimination or was retaliation, but she had received eggs, milk, and cheese prior to filing the instant action. (ECF No. 203-3 at 28-29). Wilson stated that she could buy dairy products, but Rider told her they were not offered as part of the religious diet she received. Wilson explained that she is now on a vegetarian soy allergy religious diet. (*Id.* at 30).

### *4. Analysis of Retaliation Claims*

The material facts surrounding Wilson's retaliation claims are not disputed, although the parties have varying interpretations of those facts. Applying the governing legal principles to the undisputed facts, the undersigned analyzes each of Wilson's claims of retaliation separately as follows. First, with respect to Nohe, Wilson offers no evidence that Nohe retaliated against Wilson within the applicable two-year statute of limitations. Most of Wilson's complaints regarding Nohe revolve around Wilson's 2010 parole board hearing and her 2013/2014 termination from the Paws4People program, both of which occurred more than two years before the complaint was filed in May 2018. Nohe left LCC in the middle of 2016; therefore, to escape the statute of limitations bar, Wilson must demonstrate retaliation by Nohe after April 30, 2016. Wilson simply does not do so. Her vague allegation that Nohe intimidated inmates to prevent them from filing grievances does not involve the two-year period from May 1, 2016 to the filing of the complaint and, in any event, is factually unsupported. Furthermore, Wilson does not consistently allege or factually establish that she was engaged in protected activity that prompted the alleged retaliation by Nohe, and that this protected activity was the "but for" cause of the retaliation. Wilson surmises that Nohe treated Wilson badly because of the nature of her crime, and because Nohe was friendly with the family of Wilson's victim. Even if true, these reasons do not support the conclusion that Nohe retaliated against Wilson for engaging in protected activity.

Wilson is equally empty-handed when offering evidence to support her claim that Birdsong retaliated against her. The retaliation described by Wilson is nothing more than Birdsong doing her job as librarian. Simply because the library is closed at certain times is not proof that Birdsong is retaliating against Wilson. Likewise, the fact that LCC

decided to increase the cost of copies is not evidence of retaliation against Wilson; particularly considering that Wilson has never paid the inflated rate—or anything for that matter—when copying legal documents. Wilson gives herself far too much prominence in operational decisions. As is reflected by the docket in this case, Wilson has been allowed great latitude in making and filing copies. Finally, Wilson's basis for deducing that Birdsong is retaliating against her is conclusory and unsupported. She claims that Birdsong has been irritable with her since 2010 when Wilson was bringing crowds into the library and creating a disturbance. However, Wilson's speculation simply is not fact. Wilson further asserts that Birdsong is retaliating against her because of her civil rights complaint. Other than the fact that a complaint was filed, Wilson offers no evidence to support that statement. To the contrary, the undisputed evidence shows that Birdsong has notarized numerous affidavits for Wilson to submit in support of her case and has allowed Wilson substantial use of library resources.

In regard to Wilson's claims against Spencer, Wilson suggests that Spencer retaliated against her by conducting an excessively long and abusive search of her cell; however, Wilson never articulates the nature of the protected activity, which allegedly led to Spencer's retaliation. Wilson suggests that filing a civil rights complaint was the protected activity. However, Spencer was not a party to the suit when it was filed and did not become a party until after she performed the cell search. Indeed, Wilson offers no evidence that Spencer was even aware of the suit prior to the cell search. At other points in her filings, Wilson speculates that Spencer was Nohe's crony and disliked Wilson due to the nature of her crime. She contends that Spencer had bullied and intimidated her in the past. However, verbal threats and harassment alone do not violate the Eighth Amendment. *Henslee v. Lewis*, 153 F. App'x 179, 179 (4th Cir. 2005) ("Mere threats or

verbal abuse by prison officials, without more, do not state a cognizable claim under § 1983."); *Morrison v. Martin,* 755 F. Supp. 683, 687 (E.D.N.C. 1990) ("[M]ere threatening language and gestures of a custodial officer do not, even if true, amount to constitutional violations.") (citing *Coyle v. Hughs*, 436 F. Supp. 591, 593 (W.D. Okla. 1977)). There is no factual dispute in this case that (1) the cell search was performed in response to complaints from Wilson's cellmate that she was storing human urine in the cell; and (2) Spencer did not initiate the search, but rather finished it when another correctional officer was called away. While the search was thorough and resulted in items of contraband being discovered and removed, Wilson has not demonstrated that Spencer had a retaliatory motive. Moreover, Wilson was not disciplined as a result of the contraband in her cell.

Wilson alleges even less of a motive for Ball and Rider to retaliate against her. Indeed, Wilson concedes that she does not have evidence that either Ball or Rider is liable for a personal transgression. To the contrary, Wilson joined these defendants, primarily because they had oversight responsibilities for many of the operations that Wilson challenges. (ECF Nos. 15). The law is well settled that "[t]here is no respondeat superior liability under § 1983." *Johnson v. Potomac Highlands Reg'l Jail*, No. CIV.A. 5:06CV1, 2007 WL 1258879, at *2 (N.D.W. Va. Apr. 30, 2007) (citing *Monell,* 436 U.S. at 691). In other words, "§ 1983 does not permit a state official to be held liable solely because one of his or her employees committed a tort." *Oliver v. Powell*, 250 F. Supp. 2d 593, 598 (E.D. Va. 2002) (citing *Monell, supra*). A supervisor may only be held liable under § 1983 in three circumstances.

First, "liability will lie where it is affirmatively shown that the official charged acted personally in the deprivation of the plaintiff's rights." *Johnson*, 2007 WL 1258879, at *2 (citing *Vinnedge v. Gibbs,* 550 F.2d 926, 928 (4th Cir. 1997)). Second, "when a supervisor

64

is not personally involved in the alleged wrongdoing, he may be liable under § 1983 if a subordinate acts pursuant to an official policy or custom for which he is responsible." *Id.* (citing *Fisher v. Washington Metropolitan Area Transit Authority,* 690 F.2d 1113 (4th Cir. 1982)). Third, "a supervisor may be liable under § 1983 if the following elements are established: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a 'pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to that knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offensive practices,' and (3) there was an 'affirmative causal link' between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." *Id.* (citing *Shaw v. Stroud,* 13 F.3d 791, 799 (4th Cir.1994)). A plaintiff "cannot satisfy this burden of proof by pointing to a *single incident or isolated incidents* ...." *Oliver*, 250 F. Supp. 2d at 599. Rather, "supervisory liability may only be imposed where 'there is a history of widespread abuse.'" *Id.* (quoting *Wellington V. Daniels,* 717 F.2d 932, 936 (4th Cir. 1980)).

Here, Wilson offers no evidence that Ball or Rider personally violated her constitutional rights. In most instances, they were simply responding to a grievance or IR filed by Wilson concerning an incident that had already occurred. Furthermore, Wilson has not demonstrated that Ball or Rider followed a DCR policy or custom that caused injury to her. Wilson's complaint that her legal mail was opened did not implicate a DCR custom or policy, because the mail was not designated as legal mail, a condition precedent to application of the DCR's legal mail policy. Similarly, Wilson chose to continue on the soy allergy religious diet, even though she knew that it did not offer dairy products, and she is still permitted to purchase those items. The kosher violations in the kitchen were not the result of the staff following a DCR policy, but rather were the result of them failing

to follow the policy. Finally, Wilson has not demonstrated a widespread, pervasive, and unreasonable risk of constitutional injury in the various departments of which she complains. The undisputed evidence is that Ball and Rider investigated Wilson's grievances, took steps to prevent future violations, and provided Wilson with follow-up information. Wilson acknowledges that, at least with respect to Rider, her claims may be unfounded. (ECF No. 198 at 16-17).

As to Davis, she was never served with process. In any event, Wilson has not provided evidence of retaliation with respect to her food service. The undisputed evidence indicates that there were four isolated incidents when the kitchen staff took shortcuts or ignored kosher protocols. Wilson filed a grievance regarding one of these incidents and listed the other three in her grievance. (ECF No. 15 at 7). The DCR defendants responded to the grievance by investigating and then addressing the problems with the kitchen staff. No one uncovered any proof of intentional contamination, and Wilson concedes that she does not feel the deviations from policy were intentional. (*Id.* at 5, 8). The kitchen staff was educated on the importance of following DCR operational procedures as they apply to kosher food preparation, and the kitchen staff acknowledged their understanding.

Therefore, the undersigned **FINDS** that Wilson fails to offer any evidence to support her claims of retaliation by the defendants.

### D.  Interference with Religious Beliefs—Defendants Ball, Rider, Davis

The Free Exercise Clause of the First Amendment to the United States Constitution guarantees inmates the right to free exercise of religion while incarcerated, *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987), and prohibits customs or policies that are designed to suppress religious beliefs and practices. *Morrison v. Garraghty*, 239 F.3d 648, 656 (4th Cir. 2001). In addition, the Religious Land Use and Institutionalized

66

Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc, et seq., provides that no government shall impose a substantial burden on the religious exercise of an inmate unless the government demonstrates that the burden promotes a compelling governmental interest and is the least restrictive means of furthering that interest. The failure of a correctional institution to accommodate a prisoner's religious dietary needs by serving religiously inappropriate food may state a claim under the First Amendment and the RLUIPA. *See Carter v. Fleming,* 879 F.3d 132, 140 (4th Cir. 2018) (holding that an inmate stated a plausible claim under the First Amendment and the RLUIPA when he claimed that the defendants were imposing a substantial burden on his religious exercise by serving religiously inappropriate foods on the Common Fare menu in violation of the Common Fare agreement.) (internal markings omitted).

To succeed on a claim of religious discrimination under either of these provisions, an inmate must make an initial showing that he sincerely holds a religious belief and that action by the defendants substantially burdens his religious freedom or expression. "In essence, the plaintiff's claims under the Free Exercise clause and the RLUIPA impose the same requirements: the plaintiff must allege facts showing that a particular action by a particular defendant 'substantially burdened his sincerely-held religious beliefs.'" *Blakely v. Wards*, 2011 WL 2559601, at *11 (D.S.C. May 20, 2011) (quoting *Ajaj v. Federal Bureau of Prisons*, 2011 WL 902440 (D. Colo. 2011)); *see also Wisconsin v. Yoder*, 406 U.S. 205 (1972); *Cutter v. Wilkinson*, 544 U.S. 709 (2005).

The Supreme Court has defined "substantial burden" as "substantial pressure on an adherent to modify his behavior and to violate his beliefs," *Thomas v. Review Bd. of Ind. Employment Sec. Div.*, 450 U.S. 707, 718 (1981), or an action that compels a person to "choose between following the precepts of [his] religion and forfeiting [governmental]

benefits, on the one hand, and abandoning one of the precepts of [his] religion ... on the other hand," *Sherbert v. Verner*, 374 U.S. 398, 404 (1963). "No substantial burden occurs if the government action merely makes the 'religious exercise more expensive or difficult' or inconvenient, but does not pressure the adherent to violate her religious beliefs or abandon one of the precepts of her religion." *Rountree v. Clarke*, No. 7:11CV00572, 2015 WL 1021286, at *7 (W.D. Va. Mar. 9, 2015) (quoting *Smith v. Allen*, 502 F.3d 1255, 1278 (11th Cir. 2007)). "[A]t a minimum the substantial burden test requires that a RLUIPA plaintiff demonstrate that the government's denial of a particular religious ... observance was more than an inconvenience to one's religious practice." *Baines v. Hicks*, No. 3:14CV616, 2016 WL 7380558, at *10 (E.D. Va. Dec. 20, 2016) (quoting *Smith*, 502 F.3d at 1278); *Sullivan v. Younce*, No. 3:15CV10, 2017 WL 655175, at *9 (E.D. Va. Feb. 16, 2017) (holding that removal of purported religious materials from inmate's cell was an inconvenience, not a substantial burden on his exercise of religion).

Once a plaintiff satisfies the requirement to demonstrate that the challenged practice substantially encumbers her exercise of religion, the burden of persuasion shifts to the government to demonstrate that the practice is the least restrictive means to further a compelling governmental interest. *Estes v. Clarke*, No. 7:15CV00155, 2018 WL 2709327, at *5 (W.D. Va. June 5, 2018) (citing 42 U.S.C. § 2000cc-2(b)). According to the *Estes* Court, "[t]he least-restrictive-means standard is exceptionally demanding, and it requires the government to show that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting party." *Id.* (quoting *Jehovah v. Clarke*, 798 F.3d 169, 177 (4th Cir. 2015)). Moreover, "[i]f a less restrictive means is available for the Government to achieve its goals, the Government must use it." *Id.* (quoting *Holt v. Hobbs*, 135 S. Ct. 853, 864 (2015)). When considering

whether a prison's practice is overly burdensome, "[c]ourts must give 'due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.'" *Id.* (quoting *Cutter*, 544 U.S. at 723). With respect to a religious diet, prisoners have a "right to a diet consistent with [the prisoner's] … religious scruples." *Ford v. McGinnis*, 352 F.3d 582, 597 (2d Cir. 2003). A prison official violates this right if "he intentionally, and without adequate justification, denies an inmate a diet that is religiously mandated." *Lee v. Foxwell*, No. CV ELH-18-3882, 2019 WL 5683396, at *12 (D. Md. Oct. 31, 2019). "However, only intentional conduct is actionable under the Free Exercise Clause of the First Amendment." *Id.* (citing *Lovelace v. Lee,* 472 F.3d 124, 199 (4th Cir. 2006) (holding that "negligent acts by officials causing unintended denials of religious rights do not violate the Free Exercise Clause."). Consequently, to state a valid claim, the prisoner must demosntrate "conscious or intentional interference with his free exercise rights." *Lovelace,* 472 F.3d at 201.

### 1. Wilson's Allegations and Motion for Summary Judgment

Wilson asserts that Ball and Rider have, in some vague way, interfered with her practice of her religion by refusing to customize the soy allergy religious diet to her needs. (ECF Nos. 18, 198 at 15-16). She claims that Ball and Rider have denied her request for dairy products, have allowed the kitchen staff to contaminate her vegetarian meals with meat products, and have overlooked violations of kosher food preparation protocols. Wilson further contends that Aramark's on-site supervisor, Candy Davis, violated Wilson's religious beliefs by serving her meat on occasion and by allowing the kosher kitchen to be contaminated. (ECF No. 198 at 15-16). Wilson states that the kosher sink has been used as a basin for individuals to wash their hands after using the restroom. She

contends that kosher pans and utensils are then washed in that sink. Wilson further indicates that she has seen evidence of meat and eggs prepared in the kosher kitchen. Furthermore, Wilson believes that Rider is responsible for giving her religious beliefs less attention, and she speculates that he has made it difficult for her to meet her nutritional needs, as a way of retaliating against her for being persistent in obtaining a healthy diet. (ECF No. 94 at 7). Wilson adds, however, that she may have misunderstood Rider's involvement in the deficiencies related to her diet. (ECF No. 198 at 16).

The DCR defendants respond by arguing that Wilson has only alleged four isolated instances in which the kosher kitchen was allegedly contaminated. (ECF No. 209 at 5). In each case, the allegations were fully investigated and addressed. The DCR defendants contend that Wilson has no evidence of Ball's involvement in any alleged contamination, and she admitted at her deposition that she has no proof of intentional contamination. (ECF No. 209 at 5). The DCR defendants describe Wilson's allegations as conclusory and without factual basis. The DCR defendants contest Wilson's claim that Ball or Rider is somehow responsible for the lack of dairy products in her soy allergy religious diet, emphasizing that she is on the diet voluntarily and can stop following the diet at any time if she wishes to do so.

Candy Davis has not responded to Wilson's summary judgment motion, because she has not entered an appearance in the lawsuit. The United States Marshals Service was ordered to serve this defendant upon receipt of her address for service, but no address was ever provided.

### 2. DCR Defendants' Motion for Summary Judgment

The DCR defendants assert that Wilson's claims based upon her diet should be summarily dismissed, because she offers no proof to support them. (ECF No. 206 at 14).

70

The DCR defendants indicate that Wilson first filed an inmate grievance regarding her food preparation on June 25, 2018—more than one month after she filed her lawsuit— although she now complains about four instances in which the kosher kitchen was contaminated. The outcome of the grievance was an investigation into Wilson's concerns that led to the kosher area being monitored and the food preparation rules being closely enforced. (ECF No. 206 at 15). Nothing in the investigation, or Wilson's grievance, supports her claim that Ball or Rider is responsible for the isolated instances in which the kitchen staff violated DCR policy. In any event, Wilson conceded at her deposition that she had no evidence to substantiate that any one intentionally contaminated her food. The DCR defendants indicate that neither Ball nor Rider determines which diet an inmate follows. Wilson chose to continue the soy allergy religious diet, and she can stop it whenever she wishes to do so.

In regard to Wilson's claim that Rider denied her dairy products, the DCR defendants supply an affidavit from Rider in which he states that he had no involvement in determining what products would be offered on the soy allergy religious diet. However, that diet does not include dairy products, and no special exceptions are permitted by DCR policy. The DCR defendants stress that Wilson can purchase dairy products from the commissary when she wants them.

Wilson responds primarily by reiterating her allegations. (ECF No. 215 at 38-40). She does express some reservations over the fairness of her criticism of Rider, indicating that he may have been given misinformation by other individuals, which led to the limitation of her diet.

### 3. Evidence

On May 28, 2008, Wilson submitted a request to modify her heart healthy diet,

asking for "No flesh" on her tray. (ECF No. 198-1 at 72). She identified her religion as "Wicca," noted that "eggs milk ok," and stated that she had talked to the Chaplain about a "kosher diet." (ECF No. 198-1 at 72). Her request was approved by Chaplain Morrow on May 29, 2008. (*Id.*).

On October 29, 2016, Wilson filed a grievance, complaining that Aramark had denied Wilson her "Samhain Religious Meal." (*Id.* at 162). Wilson stated, that on October 28, 2016, she was scheduled to receive a Pagan Festival Meal, but the kitchen supervisor indicated that kosher pagans were to receive a kosher meal, rather than the festival meal. Wilson spoke to the Chaplain, who assured her that she would receive a vegetarian lasagna, as lasagna was the selected entrée for the Pagan Festival Meal. However, when Wilson received her meal that evening, it consisted of a cold tortilla shell with a spoonful of beans and a spoonful of rice. The other prisoners celebrating the Pagan festival received lasagna, a large garden salad with the works, and garlic bread. (*Id.*). Wilson supplemented her grievance on November 9, 2016 with an IR asking why the kosher meals for the festival were different. (ECF No. 215-1 at 96). The unit manager responded to the grievance by promising Wilson a replacement meal. (*Id.*).

Approximately one year later, on September 11, 2017, Wilson submitted an IR asking why she had been removed from the list of inmates receiving a religious diet. (ECF No. 198-1 at 69). Chaplain Morrow explained that Wilson had been diagnosed with a soy allergy, and the existence of her allergy shifted responsibility of her diet from him to the medical staff. Consequently, he could not place her on a religious diet. (*Id.*). Chaplain Morrow advised that she would be placed on a modified version of her religious diet once the central office provided the information. Wilson again raised the issue of her kosher diet on November 16, 2017 in an IR request to Chaplain Morrow. (*Id.* at 68). Wilson stated

72

that she had been informed that no kosher meals were being served and that kosher protocols were not being followed. Chaplain Morrow contacted Aramark, who advised that Wilson was receiving a kosher meal when she came to the dining room, but that she rarely ate there. (ECF No. 198-1 at 68). Wilson responded shortly thereafter by filing another IR to Chaplain Morrow, stating she had seen with her own eyes that the kitchen staff was not preparing kosher food in compliance with the DCR's kosher policies, causing the food to be contaminated. (*Id*. at 66-67). Wilson acknowledged that she was on a modified soy allergy diet, but still expected the staff to properly prepare the food. A few days later, Wilson followed up with the kitchen staff regarding a bag lunch that allegedly contained food she was not permitted to eat. (*Id*. at 52).

On December 15, 2017, Chaplain Morrow contacted Wilson via memorandum in response to her November 19, 2017 IR. (ECF No. 3-1 at 35). Chaplain Morrow explained that the central office was reviewing the soy allergy religious diet, but in the meantime she was receiving a diet that met her religious and dietary needs. (*Id*.). Chaplain Morrow noted that the diet did not include milk products, but suggested that the review might address that issue, although the diet ultimately might remain the same.

Wilson next filed an IR on January 10, 2018. (ECF No. 198-1 at 75). She noted that on January 9, she was once again served a tray containing meat and that the kitchen was not following kosher protocols. Chaplain Morrow responded that he had discussed the matter with the Aramark supervisor, who apologized for the mistake. She indicated that a new cook had prepared the tray, and the supervisor agreed to speak with the cook and make sure the mistake did not happen again. (*Id*.). On January 29, 2018, Wilson sent an IR to Chaplain Morrow, asking if he had heard from the central office about its review of the soy allergy religious diet. Wilson stated that she needed milk in her diet given her age

73

(over 50). (*Id.* at 74). Chaplain Morrow responded that he was still waiting to hear from the central office and recommended that she seek medical care if she was concerned about her health. (ECF No. 198-1 at 74). Wilson again complained about the lack of dairy products in her diet on June 12, 2018. (*Id.* at 71).

On June 26, 2018, Wilson filed an inmate grievance form, complaining that the kitchen had contaminated her kosher meal by using the kosher area in the kitchen, as well as the pans and utensils earmarked for kosher food, to cook pork and pork gravy. (*Id.* at 137). Wilson reviewed all of the incidents where protocol had been broken, stating that she had seen the kosher area covered with eggshells on November 19, 2017, and learned that hamburgers were cooked there as well. She was served meat on her tray on January 10, 2018 and then ate a contaminated kosher meal on June 25, 2018, when she learned that pork was being prepared in the kosher area. (*Id.* at 138). Upon receiving the grievance, the unit manager spoke with the kitchen supervisor, had the kosher area extensively disinfected, and replaced the pots, pans, and utensils. All kitchen workers were trained on the rules surrounding the kosher area and were expected to actively monitor compliance. (*Id.*).

Wilson followed up with letters to Sallaz and Investigator Ramey, and on July 17, 2018 requested via a grievance that the kitchen's disregard for kosher protocol be investigated. (ECF No. 198-1 at 104, 152-53, 178). Wilson claimed that an inmate worker was instructed by Aramark to cook pork in the kosher area, that Aramark employees often used the kosher area to cook food such as hamburger, because it was more accommodating, and that the area was used to make staff meals of eggs and bacon. (*Id.* at 153). Sallaz responded to Wilson's grievance on July 27, assuring her that the matter was being addressed by Ball and the importance of adhering to the DCR's policies was

emphasized to Aramark's supervisor. (*Id.* at 152). Rider, through Sallaz, later notified Wilson that an investigation did not support the conclusion that anyone was deliberately contaminating the kosher area. (ECF 198-1 at 108).

Wilson provides several affidavits in support of her claim that her meals were not properly prepared at LCC. Inmate Robin Ladd verified that in January 2018, Wilson was served vegetables with meat in them. (*Id.* at 146). Inmates Amy Stickle and Julie Surbaugh confirmed the January 2018 incident in which Wilson received meat in her vegetables. Surbaugh also described a meal given to Wilson in December 2017, which apparently was not kosher-compliant. (*Id.* at 144-45). Alexander Bosley signed an affidavit stating that he had seen kosher trays with no protein on them, and some with meat, when the trays were supposed to have vegetables and soy meat on them. (*Id.* at 143). Alice Adams, a kosher cook in the kitchen, testified by affidavit that she had witnessed pork being cooked in the kosher area on June 25, 2018 at the direction of Aramark, and Ms. Adams removed the pot used, because it was contaminated. (*Id.* at 147). Ms. Adams stated that the kosher diet at LCC was not taken seriously.

At her deposition, Wilson testified that she was categorized as Wiccan when she first arrived at LCC. (ECF No. 203-3 at 29). That designation was changed to Pagan and then to Native American. Wilson stated that she practices a Native American faith, although she added: "I guess you would call me non-denominational, but spiritual is what I want to put on there. I'm studying all religions." (*Id.* at 29). Wilson indicated that she is vegetarian, because she does not believe in eating animals or animal products, and was placed on a religious diet. (ECF No. 203-3 at 29). She is currently on a soy allergy religious diet. (*Id.*).

Ball states in his affidavit that there have been four isolated instances when the

kosher kitchen was used in violation of religious tenets—November 2017, January 2018, and two in June 2018. Wilson only filed one grievance and that was submitted in late June 2018. After an investigation was conducted, kitchen staff was admonished to handle kosher food and cooking utensils as required by DCR policy. (ECF No. 205-23).

### 4. Analysis of Religious Discrimination Claims

Wilson is categorized by LCC as either Wiccan, Pagan, or Native American, although Wilson describes herself as non-denominational. Her allegations related to religious discrimination center on the failure of LCC to comply with kosher cooking requirements and the periodic introduction of meat into vegetarian meals served to Wilson. These allegations do not give rise to a First Amendment or RLUIPA violation. The cornerstone of a religious discrimination claim is that an inmate is being forced to forgo or violate sincerely-held religious beliefs due to state action. However, in this case, the alleged actions of the defendants do not, in any way, infringe on the religious tenets of the Wiccan, Pagan, or Native American faiths.

Wilson offers no proof that any of these religions requires its members to follow a vegetarian diet, or that any of them require food to be prepared according to kosher dictates. The undisputed evidence demonstrates that Wilson selected the kosher diet, not because she is Jewish, or follows kosher protocols, but because that diet seemed to satisfy her desire for "no flesh." Moreover, the undisputed evidence indicates that Wilson technically was not on a kosher diet when she filed the grievance, but instead was on a soy allergy religious diet. She produces no proof that the soy allergy religious diet required the kitchen to follow kosher food preparation protocols.

Notwithstanding the absence of evidence establishing that Wilson selected a kosher diet for religious reasons, or that she was actually on a kosher diet in 2018, the

undersigned will assume that Wilson's religious beliefs required a kosher diet for the purpose of this analysis. Even when making this assumption, however, the undersigned **FINDS** that Wilson fails to demonstrate that the actions of any of the defendants substantially burdened Wilson's exercise of her religious beliefs. Wilson demonstrates a handful of instances when kosher protocols were not followed, and when meat was accidentally included on her tray. These incidents do not constitute violations of the First Amendment or RLUIPA, because they were mistakes rather than deliberate actions or practices by the facility. *See Lovelace v. Lee*, 472 F.3d 174, 201 (4th Cir. 2006) ("[Plaintiff] must assert conscious or intentional interference with his free exercise rights to state a valid claim under § 1983."); *McCoy v. Aramark Correctional Services, LLC,* 2020 WL 5877613, at *7 (D. Kan. Oct. 2, 2020) (holding that Plaintiff failed to establish a claim of religious interference related to the preparation of kosher meals where there was no evidence of "any conscious or intentional interference with Plaintiff's right to receive kosher meals if he properly requests them following KDOC policy", and at most showed "isolated acts of negligence by workers" in the prison kitchen); " *Colvin v. Caruso*, 605 F.3d 282, 293-94 6th Cir. 2010) (holding that isolated incidents of prison officials providing non-kosher food to a Jewish prisoner did not violate the First Amendment); *Gallagher* v. *Shelton*, 587 F.3d 1063, 1070 (10th Cir. 2009) ("Taking [the plaintiff's] allegations as true, the fact that the utensils were not properly washed indicate[d] that the defendants imperfectly implemented the kosher requirements, or were even negligent in implementing his kosher diet. But there [wa]s no basis to conclude that any of the defendants deliberately contaminated the kosher utensils, in violation of [the plaintiff's] right to free exercise of religion, or that defendants repeatedly violated kosher requirements ... such an isolated act of negligence d[id] not support a claim that [the

plaintiff] was denied his First Amendment right to free exercise of religion.")

Wilson has not shown any policy, or operational procedure, or concerted effort of the defendants to force Wilson to eat non-kosher food or a non-vegetarian diet. To the contrary, when Wilson grieved about the laxity of the kitchen in enforcing kosher food preparation protocols, the administration took immediate steps to re-educate staff and require compliance. Wilson cannot show that occasional errors in the kitchen encumber her ability to practice her religion, nor can she prove that being required to purchase dairy products, which are not available through the soy allergy religious diet, interferes with the exercise of her spiritual beliefs.

### E. Gender Discrimination Claims—Defendants Sallaz, Jividen

Inmates are protected from gender discrimination by the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. The Equal Protection Clause directs governments that "all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (quoting *Plyler v. Doe,* 457 U.S. 202, 216 (1982)). "To state a claim under 42 U.S.C. § 1983 for a violation of the Equal Protection Clause, a plaintiff must show that the defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class." *Barren v. Harrington,* 152 F.3d 1193, 1194 (9th Cir. 1998). A plaintiff "must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Morrison v. Garraghty,* 239 F.3d 648, 654 (4th Cir.2001). "If a plaintiff makes such a showing, the court then determines whether the disparity in treatment can be justified under the requisite level of scrutiny." *Washington v. McAuliffe*, No. 7:16-CV-00476, 2019 WL 1371859, at *4 (W.D. Va. Mar. 26, 2019) (citing *Morrison*,

239 F.3d at 654).

Claims of gender discrimination are analyzed using a heightened standard of judicial scrutiny, sometimes called the "intermediate scrutiny" standard. *See Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1690 (2017); *H.B. Rowe Co. v. Tippett*, 615 F.3d 233, 242 (4th Cir. 2010) ("Precedent dictates, and the parties agree, that courts apply 'intermediate scrutiny' to statutes that classify on the basis of gender.) (citations omitted). "[A] party seeking to uphold a policy that expressly discriminates on the basis of gender must carry the burden of showing an 'exceedingly persuasive justification' for the differing treatment." *Mary Beth G. v. City of Chicago,* 723 F.2d 1263, 1273 (7th Cir. 1983) (quoting *Mississippi Univ. for Women v. Hogan,* 458 U.S. 718, 724 (1982)). In particular, "[t]he defender of legislation that differentiates on the basis of gender must show 'at least that the [challenged] classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives.'" *Morales-Santana,* 137 S. Ct. at 1690 (quoting *United States v. Virginia*, 518 U.S. 515, 533 (1996)).

"[W]hat the Equal Protection Clause requires in a prison setting is parity of treatment, as contrasted with identity of treatment, between male and female inmates." *Bukhari v. Hutto,* 487 F. Supp. 1162, 1172 (E.D. Va. 1980) (citation omitted). A reviewing court must consider the totality of prison conditions to determine whether parity exists and must remedy differences unrelated to valid penological concerns. *Id.* Importantly, an inmate's rights under the Equal Protection Clause may be subject to restrictions that are reasonably related to a legitimate penological interest. *See Morrison,* 239 F.3d at 655. "Legislative distinctions based on gender may thus be justified by an important governmental interest in recognizing demonstrated differences between males and

females. But intermediate scrutiny will reject regulations based on stereotypical and generalized conceptions about the differences between males and females." *West v. Virginia Dep't of Corr.*, 847 F. Supp. 402, 405 (W.D. Va. 1994) (quoting *Faulkner v. Jones,* 10 F.3d 226, 231 (4th Cir. 1993), *and Hogan,* 458 U.S. at 724–25)) (unconstitutional to base classifications on "traditional, often inaccurate, assumptions about the proper roles of men and women"). While some degree of deference should be given to the expertise of prison officials in the administration of prisons, *Ashann-Ra v. Com. of Va.,* 112 F. Supp. 2d 559, 571 (W.D. Va. 2000), gender disparity in the treatment of inmates must still be justified by a compelling goal. *Compare Pitts v. Thornburgh,* 866 F.2d 1450 (D.C. Cir. 1989) (policy housing long-term D.C. female inmates in West Virginia did not violate Equal Protection even though similarly situated male inmates were housed nearer to D.C., because the difference in treatment was based on the need to correct severe overcrowding in D.C. facilities and not on archaic notions of a woman's role in contemporary society) *with West,* 847 F. Supp. at 407 (holding that Virginia violated the Equal Protection Clause by offering a beneficial sentencing option of boot camp only to male inmates). "The justification must be genuine, not hypothesized or invented post hoc in response to litigation. And it must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females." *United States v. Virginia*, 518 U.S. 515, 533 (1996). "Savings in time, money and effort do not justify gender-based discrimination." *Ashann-Ra*, 112 F. Supp. 2d at 570 (citing  *Califano v. Goldfarb,* 430 U.S. 199, 217 (1977)).

### 1. *Wilson's Allegations and Motion for Summary Judgment*

Wilson claims that the DCR discriminates against female inmates by providing male inmates with better conditions of confinement. Wilson alleges that male inmates

receive higher pay than female inmates; have better education, commissary, recreation, and fundraiser options; have a laxer dress code; receive extra incentives and bonuses; are provided items denied to females and are permitted to keep them in their cells; have nicer open house accommodations; have a chapel and receive better religious meals; can access a law library every day; and are permitted visitation on parole board days. (ECF No. 198 at 19-22).

In particular, Wilson states that LCC does not have a chapel, while males facilities have chapels and also provide higher quality religious meals. (ECF No. 3-1 at 26). The inmates at male institutions, such as MOCC, can access the library every day, while female inmates at LCC are only permitted one library visit per week. (*Id*.). Male inmates earn $80 per month for prison jobs, while female inmates make only $46 for the same jobs. The inmates at male facilities receive original mail, while the females at LCC only receive copies. The male inmates have a recreation room, leather and wood shop, and craft shops, which the woman do not have at LCC.  (*Id*. at 27). Male inmates have more options from which to order supplies and foods, while the women are limited. The men at MOCC have music rooms, better commissaries, and storage areas for personal property, which are not available at LCC. (*Id*. at 28). MOCC has special units for elderly men, while LCC does not have a comparable unit for elderly women. Male inmates can earn Bachelor's degrees, but some female inmates ("lifers") cannot do so. Wilson contends that male inmates are paid $61.00 to $76.00 per month to attend college classes, while females receive only $16.00 per month. (ECF No. 198 at 19). She argues that documents provided by the DCR defendants show that male inmates are permitted to have musical instruments, personal fans, reading lamps, boom boxes, and white t-shirts, while female inmates at LCC are precluded from having these items. She adds that many items—such as hair barrettes,

liquid fabric softener, robes, wallets, X-boxes, pajamas, and long sleeve shirts—were available to her at Pruntytown, but not at LCC. (ECF No. 198 at 19-20). Finally, she claims that male inmates are permitted to shake hands, console other inmates, give hugs, share food, hang up pictures of loved ones, have pictures taken with others, but the females at LCC are disciplined for the same behavior. (*Id.* at 20).

The DCR defendants argue in response that Wilson has failed to supply any evidence to substantiate her claims of gender discrimination. (ECF No. 209 at 10). They acknowledge that there are some differences between DCR facilities, but asserts that the differences are not gender based, and Wilson has not produced any evidence to support a discriminatory intent behind the differences. In addition, the DCR defendants contend that Wilson has not exhausted administrative remedies with regard to her gender discrimination claims.

### 2. DCR Defendants' Motion for Summary Judgment

The DCR defendants note that Wilson complains against Sallaz and Jividen in their official capacities, seeking injunctive relief related to alleged gender discrimination. (ECF No. 206 at 22). The DCR defendants point out that there are 21 adult correctional facilities in West Virginia, with LCC being the only all-female institution. All 20 of the remaining facilities house male inmates. The DCR defendants recognize that the facilities are not identical, but attribute this to factors such as size and age of the physical structure, size of the inmate population, and staffing. The DCR defendants claim that none of the differences between facilities is based upon the gender of inmates. In support, they rely on the DCR's "gender neutral" policies. (ECF No. 206 at 23). The DCR defendants contend that Wilson cannot reasonably compare LCC to MOCC, because of the vast difference in inmate population between those two facilities. (*Id.* at 23). MOCC houses 1,001 inmates,

while LCC has only 389 inmates, resulting in certain necessary differences in operation.

According to the DCR defendants, other than differences compelled by inmate population size, MOCC and LCC operate essentially the same. Contrary to Wilson's assertions, the DCR defendants state that both facilities provide comparable educational opportunities, with inmates in both institutions being offered a GED-equivalent course, vocational classes, and courses designed for the inmate to acquire a Bachelor's Degree. (*Id.* at 23). The DCR defendants identify other areas of operation in which the facilities are comparable.

Wilson concedes in her response that Sallaz and Jividen have "begun to correct many of the inconsistencies between male and female prisons with the same classification, custody, and security levels." (ECF No. 215 at 32). Otherwise, she reiterates her arguments about the differences in pay and treatment.

In their reply, the DCR defendants highlight that Wilson is paid $16.00 per month for attending vocational classes, which is exactly the same wage paid to male inmates taking vocational courses. (ECF No. 218 at 8-9). The only facility that offers a monthly wage of $61.00 to $76.00 is the Huttonsville Correctional Center ("HCC"), which pays inmates an elevated wage when they are taking college classes and are acting as teacher's aides at Glenville State College. The DCR defendants emphasize that most of Wilson's allegations regarding gender discrimination are based entirely upon speculation, or undocumented and unsupported anecdotal statements by a transgender inmate named Alexander Bosley, who transferred from MOCC to LCC.

### 3. *Evidence*

Wilson's proof of gender discrimination, in large part, is anecdotal, or is based on the difference in the way she was treated at Pruntytown, which was then a co-ed facility,

with how she is treated at LCC. She also points to efforts of the current Administration at LCC to "correct" discrimination as proof of gender disparity. In addition, Wilson supplies IR's that she has submitted since her transfer to LCC. On August 12, 2016, Wilson completed an IR, asking that the pay scale at LCC be re-addressed in view of rising commissary costs. (ECF No. 198-1 at 25). She stated that she made more money at Pruntytown. Sallaz responded that the pay scale had been reviewed and adjusted as deemed appropriate. (*Id.*).

In June 2017, Wilson contacted the Office of Senator Joe Manchin to share concerns about the rights of female inmates in West Virginia. (ECF No. 3-1 at 23). She wrote a letter to Senator Manchin on September 13, 2017, outlining specific concerns she had about the treatment of female inmates, although the concerns were not represented to be evidence of gender discrimination in DCR facilities. (*Id.* at 24-25). Wilson filed another IR on April 12, 2018 inquiring as to why LCC had not had any fundraisers. (ECF No. 198-10 at 24). She noted that it had been almost a year since the last event. She was told that they would be done at an appropriate time, and the population would be notified. On November 8, 2018, Wilson submitted an IR asking if she could order a heating pad. (*Id.* at 28). At some point, Wilson sent a letter to central office complaining that women inmates do not have an arts and crafts center that is as good as the one available to male inmates. (ECF No. 215 at 82). Wilson wrote a letter to Sallaz on June 24, 2019, thanking him for installing outside shelters, and asking him about other items that she felt were available at male institutions, but not at LCC; for example, portable fans, clip-on lights, and heating pads. (ECF No. 198-1 at 19-20). Sallaz explained that he stopped allowing fans, because they had to be battery operated and inmates at LCC kept throwing used batteries in the toilet, causing damage to the local Public Service Department's

equipment. Wilson argued that fans could be ordered from a company Walkenhorst, which was available to male inmates. These fans have cords rather than batteries. She also wanted heating pads and reading lights. (ECF No. 198-1 at 19-20).

Jividen, the Commissioner of the DCR, submits an affidavit confirming that the DCR's policies are gender neutral and were developed with legitimate penological purposes in mind. (ECF No. 205-29). Jividen notes that Wilson has not identified a single DCR policy that is discriminatory against women. Jividen contends that, based on affidavits provided by Sallaz and Ames, the superintendents of LCC and MOCC, these facilities generally offer the same opportunities, with slight differences being related to the needs of the individual institutions. For example, MOCC's law library is open more often than LCC's library, but that is because there are substantially more inmates at MOCC than at LCC. Jividen refers to certain relevant policies, including Policy 329.00, which governs library processes, and Policy 500.00, which discusses inmate pay, both of which Jividen describes as gender neutral. She notes that, contrary to Wilson's allegation, the wage scale at LCC is equivalent to that found at male facilities.

Sallaz files an affidavit testifying that the DCR has 21 adult correctional facilities, and MOCC is not the only all-male facility; therefore, Wilson's description of MOCC as the "brother" institution to LCC is incorrect. (ECF No. 205-30). According to Sallaz, opportunities available to DCR inmates may vary from facility to facility to some degree, but the differences are due to variations in the age and size of physical facilities and the needs of the inmate populations. Sallaz indicates that all working inmates are paid between $6.00 to $81.00 per month, depending on the job duties. He confirms that the inmate wages at LCC are comparable to those at MOCC. Sallaz provides detail regarding the educational, recreational, and social activities of LCC, which Sallaz describes as being

equivalent to those offered at the DCR's male institutions. He notes that LCC has 389 inmates.

Donald Ames, superintendent of MOCC, likewise provides an affidavit. (ECF No. 205-42). Ames disputes Wilson's characterization of MOCC as being the "brother" institution to LCC. He notes that there are 21 adult correctional facilities in West Virginia, and MOCC is not the only all-male prison. He states that there are differences between the facilities, because some are older while some are more modern; some are larger—MOCC houses over 1,000—while some, like LCC, are smaller. Ames testifies that the wage scale offered to inmates is generally the same at every institution and is based on the DCR's gender-neutral policy. Inmate jobs differ at the various facilities depending on the needs of each facility. Ames discusses the educational opportunities at MOCC and confirms that all educational programs, except for Bible College, are approved and administered through West Virginia's Department of Education. Ames lists the recreational opportunities available at MOCC and adds that MOCC has stricter segregation recreation than that which is available at LCC. He states that MOCC has a two-day annual open house, but emphasizes that it is two days because only half the inmates can attend at one time. Ames testifies that MOCC does not routinely allow visitation prior to parole hearings and has a similar dress code as that followed at LCC. Ames further compares MOCC and LCC with respect to incentives and services, indicating that both offer medical care, religious diets, freedom to worship, and the ability for inmates to order personal items. He disputes that there are significant differences between the facilities related to the availability of items such as word processors, gaming systems, and heating pads.

The DCR defendants provide a list of the educational, recreational, volunteer,

religious, and social service programs available at LCC, as well as job opportunities available to LCC's inmates. (ECF Nos. 205-31, 205-45). The DCR defendants likewise supply course listings and other materials for educational opportunities at MOCC. (ECF No. 228-2 at 3-16). These materials demonstrate that inmates at MOCC can obtain certifications in culinary arts, tutoring, construction, general building maintenance, as well as Associates' and Bachelor's degrees from Ashland University. There is also a range of adult education courses and a career development program. LCC likewise offers adult education courses, career development classes, business education classes, and certifications in cosmetology, aesthetics, culinary arts, and dog grooming. (*Id.* at 21). Inmates at LCC can enroll in college classes offered by Ashland University or West Virginia State University to work toward a degree. Specific to Wilson's claim of wage disparity in education, the DCR defendants provide the affidavit of Debra Fincham, the Inmate Employment Coordinator at HCC, who confirms that the only DCR inmates receiving $61.00 to $76.00 for college-related work are inmates at HCC who work in "teacher's aide" positions at Glenville State College. Otherwise, male and female students are paid the same for class attendance. (ECF No. 209-1).

The DCR defendants submit DCR Policy No. 500.00, which discusses work assignments, and education participation and eligibility. (ECF No. 205-32) They further supply pay scales from LCC, MOCC, Salem Correctional Center ("SCC"), Pruntytown, HCC, Northern Correctional Facility ("NCF"), and St. Mary's Correctional Center ("SMCC") for comparison. (ECF Nos. 205-32, 205-33, 205-34, 205-35, 203-36, 205-37, 205-38, 205-39, 205-40). A review of DCR Policy No. 500.00 demonstrates that it is gender neutral and assigns the responsibilities of job descriptions, job assignments, job evaluations, pay classifications, and wages to a Work Assignment Coordinator or Work

Assignment Committee at each facility. (ECF No. 228-2 at 45-55). The Warden is responsible for appointing the relevant person or people to oversee work assignments. (*Id.*). LCC's operational policy was provided and is consistent with the overall guidance promulgated by the DCR. (ECF No. 228-2 at 56-69). The pay scales reflect a range of pay for various occupations, although all of the salaries fall within the range of $15.00 to $81.00 per month. (*Id.*).

The inmate pay scales at LCC and HCC demonstrate pay rates at between $16.00 per month to $81.00 per month at both facilities, with HCC having a few more levels of pay in certain occupations that provide for higher maximum income. (ECF No. 228-2 at 17-19, 22). For example, HCC has a top level of recreation assistant that pays $61.00 per month, while LCC's top level for that position is $55.00 per month. Teacher's aides at HCC can make a top wage of $61.00 per month, while LCC's teacher's aides make a top wage of $55.00. (*Id.*). Some vocational classes pay male inmates $26.00 per month, while inmates at LCC make $16.00 per month.

With respect to MOCC, the job duties vary from those at LCC in significant ways; however, no position at MOCC pays more than the highest pay available at LCC, which is $81.00 per hour. (ECF No. 205-35, 228-2 at 22). Custodians at MOCC can make a maximum salary of $81.00 per month, while janitors at LCC earn $68.00 at most. Recreation workers at both facilities made comparable wages, as did yard crews. LCC offered more employment opportunities in support services and food services than did MOCC. (*Id.*).

The DCC inmate work assignment operational policy provides another example of inmate pay. (ECF No. 205-36). This policy shows that inmates at DCC, who are all male, receive less pay for food service than is received by the inmates at LCC. Janitorial services

at DCC are limited to a maximum of $36.00 per month, while inmates performing similar jobs at LCC can earn as much as $68.00 per month. However, maintenance workers at DCC have a maximum salary of $76.00 per month, while similar jobs at LCC have a top salary of $71.00 per month. Inmates at DCC can make no more than $56.00 per month for support work, while the maximum salary at LCC is $81.00 plus bonus. (ECF Nos. 205-36, 228-2 at 22-23).

The DCR defendants offer the DCR's Policy Directive 400.03, entitled "Issuance of Property to Inmates," along with an "Approved Property Items" list, which sets out all of the property inmates can possess at the various DCR facilities. (ECF Nos. 228-2 at 24-44). The policy is gender neutral, providing guidance on how to transfer property with inmates, perform intake body and property searches, inventory inmate property, store property, and various other related activities. (*Id.* at 24-31). The wardens are provided with the DCR's approved items list and are permitted to restrict or remove items, but they are prohibited from adding items to the list. (*Id.* at 27). The approved items vary somewhat from facility to facility. For example, only MOCC inmates are permitted to have boom boxes; only MOCC, HCC, NCF, LCC, and Pruntytown inmates can possess PlayStations, while only MOCC, HCC, NCF, LCC, PCC, SCC, and Stevens/McDowell can use Xbox. Only PCC, DCC, and NCF are allowed to have extension cords. Only inmates at MOCC can have reading lamps and shelves. Typewriters can be possessed only by inmates at MOCC, LCC, and NCF. (*Id.* at 32-44). Not all DCR inmates are permitted to have televisions, fans, and musical instruments. Only female inmates can have hair color, hair dryers, hair rollers, barrettes, perms, lipstick, and make-up. (*Id.*).

During her deposition, Wilson testified that, since the filing of her lawsuit, LCC has implemented certain operational changes that have equalized the treatment of inmates at

LCC with the treatment of MOCC inmates. (ECF No. 203-3 at 37). She acknowledged that the law library accessibility at LCC has increased, additional gaming systems are now available, although she complains that LCC still does not have a chapel. (Id. at 37- 38).

### 4. *Analysis of Gender Discrimination Claims*

Wilson argues, in large part, that there must be gender discrimination at DCR facilities, because she had more opportunities when housed at Pruntytown, a co-ed facility, than she has at LCC, an all-female institution. A review of the undisputed evidence demonstrates that there are differences between DCR facilities. However, with the exception of the certification courses, the differences do not appear on their face to be related to gender, and Wilson offers no evidence to support her allegations of discrimination.

As the DCR defendants point out, both LCC and MOCC—the institution that Wilson uses as a comparator—offer educational opportunities, including Associate Degrees, Bachelor's Degrees, certifications, and vocational training. In fact, Wilson reportedly obtained a Bachelor's Degree, as well as training in cosmetology, while incarcerated at LCC. The major areas of study vary, but the educational programs offered at both facilities are approved by the West Virginia Department of Education. While the certification courses at LCC (cosmetology, culinary arts, dog grooming, and aesthetics) compared with those at MOCC (culinary arts, tutoring, construction, general building maintenance) reflect an outdated view of gender roles in the United States, the DCR defendants are correct that Wilson failed to exhaust her administrative remedies before filing suit. Wilson has not filed a grievance complaining that she was denied the right to obtain a construction, tutoring, or building maintenance certification available only to male inmates. Indeed, based on the record before the Court, Wilson has never filed ***any***

grievances related to issues of gender disparity or discrimination in DCR facilities.

The evidence further reflects that word processors are generally prohibited at both LCC and MOCC, although typewriters are permitted at both facilities. Both facilities have access to gaming systems and various recreational activities overseen by a recreational director. As to pay scale, the DCR defendants provided the pay scales used by multiple institutions, including MOCC, LCC, and HCC, which is the largest all-male institution in the DCR system. There are variations; some of which favor female inmates and some of which favor male inmates. However, even a close comparison of the wage scales do not, alone, reflect inherent gender bias. Certainly, the DCR policy governing inmate work assignments is gender neutral and places a top and bottom wage limit to be applied at all DCR facilities, regardless of the gender of the inmates. LCC offers jobs in the lower range of the pay scale, but also offers jobs that pay the DCR's highest authorized monthly wage.

Many of the differences noted by Wilson can be attributed to the difference in inmate populations and physical plants, as explained by the DCR defendants. For instance, MOCC has a two-day annual open house, while LCC's is only one day. But this is due to the fact that MOCC has 1,000 inmates, while LCC has only 389. Consequently, for logistical reasons, MOCC inmates are divided in half, with some attending the first day of the open house and others attending the second day. In contrast, all of the LCC inmates are able to attend the open house on the same day. Bottomline, each inmate at MOCC and each inmate at LCC can participate in one day of activities at an annual open house. This same rationale explains the extended library hours at MOCC.

In the absence of proof that gender discrimination is a motivating factor in the differences between DCR correctional facilities, the undersigned **FINDS** that Wilson fails to state an equal protection claim sufficient to withstand summary judgment in favor of

the defendants. The undersigned further **FINDS** that Wilson has failed to exhaust her administrative remedies as to her claim of gender discrimination.

### F.  Miscellaneous Claims

#### 1.  *Liberty Interest*

Wilson asserts a "liberty interest" violation related to alleged statements made in the early to mid-2000s by DCR representatives. First, she claims that she was given a promise by DCR representatives that all of her medical needs would be met in the future if she refrained from filing a lawsuit against the DCR. (ECF No. 3 at 16-17). According to Wilson, prior to her transfer to LCC, she was involved in two accidents; one happened in 2002 during a sporting event at Pruntytown and resulted in her knee injury. The other was a traffic accident, which occurred when she was traveling in a truck driven by a correctional officer, who was transporting her for physical therapy. The truck was struck in the side, causing Wilson to fall to the floor and exacerbating her knee injury. Legal counsel began contacting Wilson about filing a suit against the DCR, but Wilson agreed to forgo any rights she had as long as the DCR would provide her with medical care. Wilson claims that the DCR lived up to its bargain until Wilson was transferred to LCC. (ECF No. 3 at 17). After arriving at LCC, many medical supplies and aids were taken from the inmates, including Wilson, and the special brace made for Wilson's knee was stored in a DCR closet and eventually lost.

Wilson further claims a violation of a liberty interest in relation to the DCR's assurance that the women being moved from Pruntytown to LCC would not be treated unfairly or differently from other inmates. (ECF No. 3 at 19). They were also promised that the opportunities available at Pruntytown would not be eliminated or changed at LCC. Wilson claims that, despite these promises, LCC did not offer the same quality of life

she had at Pruntytown. Later, she learned that male inmates received a much higher level of service and greater privileges than the women at LCC.

The Supreme Court has recognized that States may, under certain circumstances, create liberty interests which are protected by the Due Process Clause of the Fourteenth Amendment. *Sandin v. Conner,* 515 U.S. 472, 483-84 (1995). In the prison setting, these interests are generally "limited to freedom from restraint which ... imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 484. "A prisoner claiming a violation of his right to procedural due process must show: (1) that there is a 'state statute, regulation, or policy [that] creates such a liberty interest,' and (2) that 'the denial of such an interest imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Martin v. Duffy*, 858 F.3d 239, 253 (4th Cir. 2017) (quoting *Prieto v. Clarke*, 780 F.3d 245, 248-49 (4th Cir. 2015)).

As a general matter, inmates have no liberty interest in holding a prison job, or in being housed in a particular institution, or at a particular custody level. *See Barnes v. Anderson*, No. CV PWG-20-100, 2020 WL 7351656, at *5 (D. Md. Dec. 15, 2020) (citations omitted). Similarly, inmates have no constitutional right to access prison programs, or to participate in higher education. *Rhodes v. Chapman*, 452 U.S. 337, 348 (1981). Rather, "given a valid conviction, the criminal defendant has been constitutionally deprived of his liberty to the extent that the State may confine him and subject him to the rules of its prison system so long as the conditions of confinement do not otherwise violate the Constitution." *Meachum v. Fano,* 427 U.S. 215, 224 (1976). "[C]hanges in a prisoner's location, variations of daily routine, changes in conditions of confinement (including administrative segregation) and the denial of privileges ... are necessarily functions of prison management that must be left to the broad discretion of prison administrators to

enable them to manage prisons safely and efficiently." *Gaston v. Taylor*, 946 F.2d 340, 343 (4th Cir. 1991).

Other than unsupported statements by Wilson that "assurances" were made to her regarding her medical care and were made to all of the female inmates moved to LCC, there is no evidence that the State of West Virginia created any specific liberty interest in the daily routines and conditions of confinement at Pruntytown or LCC. Wilson provides no state statute, regulation, or policy guaranteeing the inmates transferred to LCC that their lives would remain the same and that property lists, programs, and educational opportunities would never change. Wilson is entitled to constitutionally sufficient food, medical care, and protection, but the day-to-day operations of each correctional facility fall within the broad discretion of prison officials, taking into consideration the changing needs of the facility and legitimate penological concerns. Therefore, the undersigned **FINDS** that the DCR defendants are entitled to summary judgment on Wilson's liberty interest claim.

### 2.  *Claims Against Ball Based on his Oversight Role*

In addition to her claims of retaliation, Wilson seeks to hold Ball responsible for alleged constitutional violations that occurred in departments over which Ball had oversight. Wilson asserts, without further explanation, that Ball is liable for the poor medical care offered by Wexford and Beegle; that he is liable for the improper copying of her legal mail; and that he bears responsibility for the kitchen staff's violations of kosher food preparation protocols.

As previously discussed, there are only three ways in which a supervisor can be held liable for the tortious acts of his subordinates. First, the supervisor can be liable if he personally participated in the constitutional violation. Wilson offers no evidence that Ball

directed the medical care, copied her mail, or cooked her meals. As such, he is not personally implicated in the alleged violations. Second, Ball may be liable as a supervisor if the medical department, mail room, and kitchen were acting pursuant to an official policy for which Ball was responsible. This was not the case. Wilson has not shown that Ball had any responsibility for Wexford's policies, and the mail room and kitchen were accused of ***not*** following the official policies of the DCR when copying legal mail and contaminating the kosher area of the kitchen. Finally, Ball may be liable to Wilson if he knew of a pervasive and unreasonable risk of constitutional injury due to the actions of the medical unit, the mail room, and the kitchen, and was deliberately indifferent to the risk. Wilson has not shown that Ball was aware of inadequate medical care, improper mail handling, and violations of kosher protocols by the kitchen, which he left unchecked. To the contrary, the evidence indicates that when Ball was made aware of allegations of mistakes or wrongdoing, he investigated them and implemented corrective action when necessary.

Therefore, the undersigned **FINDS** that Wilson fails to demonstrate a factual foundation upon which to impose supervisory liability on Ball.

## IV.    **Proposal and Recommendation**

For the reasons set forth above, the undersigned respectfully **RECOMMENDS** that the Presiding District Judge **DENY** the Summary Judgment Motion filed by Wilson, (ECF No. 198); **GRANT** the Summary Judgment Motions of Wexford, Beegle, and the DCR defendants, (ECF Nos. 201, 203, 205); **GRANT** the dismissal of defendant Candy Davis, who was never properly served with process; **DISMISS** the amended complaint, with prejudice; and **REMOVE** this case from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is

hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, The parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing parties, Judge Chambers. and Magistrate Judge Eifert.

The Clerk is instructed to provide a copy of this "Proposed Findings and Recommendations" to Plaintiff and counsel of record.

**FILED:** January 4, 2021

Cheryl A. Eifert
United States Magistrate Judge